# UNITED STATES ET AL. *v.* UNITED FOODS, INC.

No. 00–276.   Argued April 17, 2001—Decided June 25, 2001

406

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, SOUTER, and THOMAS, JJ., joined. STEVENS, J., *post*, p. 417, and THOMAS, J., *post*, p. 418, filed concurring opinions. BREYER, J., filed a dissenting opinion, in which GINSBURG, J., joined, and in which O'CONNOR, J., joined as to Parts I and III, *post*, p. 419.

*Barbara McDowell* argued the cause for the United States. With her on the brief were *Acting Solicitor General Underwood, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *Douglas N. Letter.*

*Laurence H. Tribe* argued the cause for respondent. With him on the brief were *Thomas C. Goldstein* and *Bradley A. MacLean.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *Mary E. Hackenbracht,* Senior Assistant Attorney General, and *Edna Walz,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Jennifer M. Granholm* of Michigan, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Betty D. Montgomery* of Ohio, *D. Michael Fisher* of Pennsylvania, and *Christine O. Gregoire* of Washington; for the American Mushroom Institute et al. by *John G. Roberts, Jr., David G. Leitch,* and *Richard T. Rossier;* and for the Western Mushroom Marketing Association et al. by *Kendall L. Manock, Robert D. Wilkinson,* and *Linda Berg Othman.*

Briefs of *amici curiae* urging affirmance were filed for the Center for Individual Freedom by *Erik S. Jaffe* and *Renee Giachino;* for the Coalition of Cotton Apparel Importers by *Daniel M. Price;* for the DKT Liberty Project by *Julia M. Carpenter;* for Gerawan Farming, Inc., et al. by *Michael W. McConnell* and *Brian C. Leighton;* for the Institute for Justice by *William H. Mellor, Clint Bolick,* and *Scott G. Bullock;* for the Washington Legal Foundation by *Daniel J. Popeo* and *R. Shawn Gunnarson;* and for Jeanne Charter et al. by *Vernon E. Woodward* and *Lynn A. Hayes.*

JUSTICE KENNEDY delivered the opinion of the Court.

Four Terms ago, in *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457 (1997), the Court rejected a First Amendment challenge to the constitutionality of a series of agricultural marketing orders that, as part of a larger regulatory marketing scheme, required producers of certain California tree fruit to pay assessments for product advertising. In this case a federal statute mandates assessments on handlers of fresh mushrooms to fund advertising for the product. The Court of Appeals for the Sixth Circuit determined the mandated payments were not part of a more comprehensive statutory program for agricultural marketing, thus dictating a different result than in *Glickman*. It held the assessment requirement unconstitutional, and we granted certiorari. 531 U. S. 1009 (2000).

The statute in question, enacted by Congress in 1990, is the Mushroom Promotion, Research, and Consumer Information Act, 104 Stat. 3854, 7 U. S. C. § 6101 *et seq.* The Act authorizes the Secretary of Agriculture to establish a Mushroom Council to pursue the statute's goals. Mushroom producers and importers, as defined by the statute, submit nominations from among their group to the Secretary, who then designates the Council membership. 7 U. S. C. §§ 6104(b) (1)(B), 6102(6), 6102(11). To fund its programs, the Act allows the Council to impose mandatory assessments upon handlers of fresh mushrooms in an amount not to exceed one cent per pound of mushrooms produced or imported. § 6104(g)(2). The assessments can be used for "projects of mushroom promotion, research, consumer information, and industry information." § 6104(c)(4). It is undisputed, though, that most moneys raised by the assessments are spent for generic advertising to promote mushroom sales.

Respondent United Foods, Inc., is a large agricultural enterprise based in Tennessee. It grows and distributes many crops and products, including fresh mushrooms. In 1996 respondent refused to pay its mandatory assessments under

the Act. The forced subsidy for generic advertising, it contended, is a violation of the First Amendment. Respondent challenged the assessments in a petition filed with the Secretary. The United States filed an action in the United States District Court for the Western District of Tennessee, seeking an order compelling respondent to pay. Both matters were stayed pending this Court's decision in *Glickman.*

After *Glickman* was decided, the Administrative Law Judge dismissed respondent's petition, and the Judicial Officer of the Department of Agriculture affirmed. Respondent sought review in District Court, and its suit was consolidated with the Government's enforcement action. The District Court, holding *Glickman* dispositive of the First Amendment challenge, granted the Government's motion for summary judgment. App. to Pet. for Cert. 18a.

The Court of Appeals for the Sixth Circuit held this case is not controlled by *Glickman* and reversed the District Court. 197 F. 3d 221 (1999). We agree with the Court of Appeals and now affirm.

A quarter of a century ago, the Court held that commercial speech, usually defined as speech that does no more than propose a commercial transaction, is protected by the First Amendment. *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 762 (1976). "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish." *Edenfield* v. *Fane,* 507 U. S. 761, 767 (1993).

We have used standards for determining the validity of speech regulations which accord less protection to commercial speech than to other expression. See, *e. g., ibid.; Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557 (1980). That approach, in turn, has been subject to some criticism. See, *e. g., Glickman, supra,* at 504 (THOMAS, J., dissenting); *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 518 (1996) (THOMAS, J., concurring in

part and concurring in judgment); *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 493 (1995) (STEVENS, J., concurring in judgment). We need not enter into the controversy, for even viewing commercial speech as entitled to lesser protection, we find no basis under either *Glickman* or our other precedents to sustain the compelled assessments sought in this case. It should be noted, moreover, that the Government itself does not rely upon *Central Hudson* to challenge the Court of Appeals' decision, Reply Brief for Petitioners 9, n. 7, and we therefore do not consider whether the Government's interest could be considered substantial for purposes of the *Central Hudson* test. The question is whether the government may underwrite and sponsor speech with a certain viewpoint using special subsidies exacted from a designated class of persons, some of whom object to the idea being advanced.

Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views, see *Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), or from compelling certain individuals to pay subsidies for speech to which they object. See *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977); *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990); see also *Glickman, supra,* at 469, n. 13. Our precedents concerning compelled contributions to speech provide the beginning point for our analysis. The fact that the speech is in aid of a commercial purpose does not deprive respondent of all First Amendment protection, as held in the cases already cited. The subject matter of the speech may be of interest to but a small segment of the population; yet those whose business and livelihood depend in some way upon the product involved no doubt deem First Amendment protection to be just as important for them as it is for other discrete, little noticed groups in a society which values the freedom resulting from speech in all its diverse parts. First

Amendment concerns apply here because of the requirement that producers subsidize speech with which they disagree.

"[T]he general rule is that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield, supra*, at 767. There are some instances in which compelled subsidies for speech contradict that constitutional principle. Here the disagreement could be seen as minor: Respondent wants to convey the message that its brand of mushrooms is superior to those grown by other producers. It objects to being charged for a message which seems to be favored by a majority of producers. The message is that mushrooms are worth consuming whether or not they are branded. First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors; and there is no apparent principle which distinguishes out of hand minor debates about whether a branded mushroom is better than just any mushroom. As a consequence, the compelled funding for the advertising must pass First Amendment scrutiny.

In the Government's view the assessment in this case is permitted by *Glickman* because it is similar in important respects. It imposes no restraint on the freedom of an objecting party to communicate its own message; the program does not compel an objecting party (here a corporate entity) itself to express views it disfavors; and the mandated scheme does not compel the expression of political or ideological views. See *Glickman*, 521 U. S., at 469–470. These points were noted in *Glickman* in the context of a different type of regulatory scheme and are not controlling of the outcome. The program sustained in *Glickman* differs from the one under review in a most fundamental respect. In *Glickman* the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself,

far from being ancillary, is the principal object of the regulatory scheme.

In *Glickman* we stressed from the very outset that the entire regulatory program must be considered in resolving the case. In deciding that case we emphasized "the importance of the statutory context in which it arises." *Id.*, at 469. The California tree fruits were marketed "pursuant to detailed marketing orders that ha[d] displaced many aspects of independent business activity." *Id.*, at 469. Indeed, the marketing orders "displaced competition" to such an extent that they were "expressly exempted from the antitrust laws." *Id.*, at 461. The market for the tree fruit regulated by the program was characterized by "[c]ollective action, rather than the aggregate consequences of independent competitive choices." *Ibid.* The producers of tree fruit who were compelled to contribute funds for use in cooperative advertising "d[id] so as a part of a broader collective enterprise in which their freedom to act independently [wa]s already constrained by the regulatory scheme." *Id.*, at 469. The opinion and the analysis of the Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation.

The features of the marketing scheme found important in *Glickman* are not present in the case now before us. As respondent notes, and as the Government does not contest, cf. Brief for Petitioners 25, almost all of the funds collected under the mandatory assessments are for one purpose: generic advertising. Beyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions.

As the Court of Appeals recognized, there is no "heavy regulation through marketing orders" in the mushroom market. 197 F. 3d, at 225. Mushroom producers are not forced to associate as a group which makes cooperative decisions. "[T]he mushroom growing business . . . is unregulated, except for the enforcement of a regional mushroom advertising program," and "the mushroom market has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through price supports or restrictions on supply." *Id.*, at 222, 223.

It is true that the party who protests the assessment here is required simply to support speech by others, not to utter the speech itself. We conclude, however, that the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity. See, *e. g., Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977); *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990).

The Government claims that, despite the lack of cooperative marketing, the *Abood* rule protecting against compelled assessments for some speech is inapplicable. We did say in *Glickman* that *Abood* "recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's 'freedom of belief.'" 521 U. S., at 471 (quoting *Abood*, 431 U. S., at 235). We take further instruction, however, from *Abood*'s statement that speech need not be characterized as political before it receives First Amendment protection. *Id.*, at 232. A proper application of the rule in *Abood* requires us to invalidate the instant statutory scheme. Before addressing whether a conflict with freedom of belief exists, a threshold inquiry must be whether there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place. In

*Abood,* the infringement upon First Amendment associational rights worked by a union shop arrangement was "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress.", *Id.,* at 222. To attain the desired benefit of collective bargaining, union members and nonmembers were required to associate with one another, and the legitimate purposes of the group were furthered by the mandated association.

A similar situation obtained in *Keller* v. *State Bar of Cal., supra.* A state-mandated, integrated bar sought to ensure that "all of the lawyers who derive benefit from the unique status of being among those admitted to practice before the courts [were] called upon to pay a fair share of the cost." *Id.,* at 12. Lawyers could be required to pay moneys in support of activities that were germane to the reason justifying the compelled association in the first place, for example, expenditures (including expenditures for speech) that related to "activities connected with disciplining members of the Bar or proposing ethical codes for the profession." *Id.,* at 16. Those who were required to pay a subsidy for the speech of the association already were required to associate for other purposes, making the compelled contribution of moneys to pay for expressive activities a necessary incident of a larger expenditure for an otherwise proper goal requiring the cooperative activity. The central holding in *Keller,* moreover, was that the objecting members were not required to give speech subsidies for matters not germane to the larger regulatory purpose which justified the required association.

The situation was much the same in *Glickman.* As noted above, the market for tree fruit was cooperative. To proceed, the statutory scheme used marketing orders that to a large extent deprived producers of their ability to compete and replaced competition with a regime of cooperation. The mandated cooperation was judged by Congress to be necessary to maintain a stable market. Given that producers

were bound together in the common venture, the imposition upon their First Amendment rights caused by using compelled contributions for germane advertising was, as in *Abood* and *Keller*, in furtherance of an otherwise legitimate program. Though four Justices who join this opinion disagreed, the majority of the Court in *Glickman* found the compelled contributions were nothing more than additional economic regulation, which did not raise First Amendment concerns. *Glickman*, 521 U. S., at 474; see *id.*, at 477 (SOUTER, J., dissenting).

The statutory mechanism as it relates to handlers of mushrooms is concededly different from the scheme in *Glickman;* here the statute does not require group action, save to generate the very speech to which some handlers object. In contrast to the program upheld in *Glickman*, where the Government argued the compelled contributions for advertising were "part of a far broader regulatory system that does not principally concern speech," Reply Brief for Petitioner, O. T. 1996, No. 95–1184, p. 4, there is no broader regulatory system in place here. We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself. Although greater regulation of the mushroom market might have been implemented under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U. S. C. § 601 *et seq.*, the compelled contributions for advertising are not part of some broader regulatory scheme. The only program the Government contends the compelled contributions serve is the very advertising scheme in question. Were it sufficient to say speech is germane to itself, the limits observed in *Abood* and *Keller* would be empty of meaning and significance. The cooperative marketing structure relied upon by a majority of the Court in *Glickman* to sustain an ancillary assessment finds no corollary here; the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of *Abood* extends to the party

who objects to the compelled support for this speech. For these and other reasons we have set forth, the assessments are not permitted under the First Amendment.

Our conclusions are not inconsistent with the Court's decision in *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985), a case involving attempts by a State to prohibit certain voluntary advertising by licensed attorneys. The Court invalidated the restrictions in substantial part but did permit a rule requiring that attorneys who advertised by their own choice and who referred to contingent fees should disclose that clients might be liable for costs. Noting that substantial numbers of potential clients might be misled by omission of the explanation, the Court sustained the requirement as consistent with the State's interest in "preventing deception of consumers." *Id.*, at 651. There is no suggestion in the case now before us that the mandatory assessments imposed to require one group of private persons to pay for speech by others are somehow necessary to make voluntary advertisements nonmisleading for consumers.

The Government argues the advertising here is government speech, and so immune from the scrutiny we would otherwise apply. As the Government admits in a forthright manner, however, this argument was "not raised or addressed" in the Court of Appeals. Brief for Petitioners 32, n. 19. The Government, citing *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374 (1995), suggests that the question is embraced within the question set forth in the petition for certiorari. In *Lebron*, the theory presented by the petitioner in the brief on the merits was addressed by the court whose judgment was being reviewed. *Id.*, at 379. Here, by contrast, it is undisputed that the Court of Appeals did not mention the government speech theory now put forward for our consideration.

The Government's failure to raise its argument in the Court of Appeals deprived respondent of the ability to ad-

dress significant matters that might have been difficult points for the Government. For example, although the Government asserts that advertising is subject to approval by the Secretary of Agriculture, respondent claims the approval is *pro forma.* This and other difficult issues would have to be addressed were the program to be labeled, and sustained, as government speech.

We need not address the question, however. Although in some instances we have allowed a respondent to defend a judgment on grounds other than those pressed or passed upon below, see, *e. g., United States* v. *Estate of Romani,* 523 U. S. 517, 526, n. 11 (1998), it is quite a different matter to allow a petitioner to assert new substantive arguments attacking, rather than defending, the judgment when those arguments were not pressed in the court whose opinion we are reviewing, or at least passed upon by it. Just this Term we declined an invitation by an *amicus* to entertain new arguments to overturn a judgment, see *Lopez* v. *Davis,* 531 U. S. 230, 244, n. 6 (2001), and we consider it the better course to decline a party's suggestion for doing so in this case.

For the reasons we have discussed, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring.

JUSTICE BREYER has correctly noted that the program at issue in this case, like that in *Glickman* v. *Wileman Brothers & Elliott, Inc.,* 521 U. S. 457 (1997), "does not compel speech itself; it compels the payment of money." *Post,* at 425 (dissenting opinion). This fact suffices to distinguish these compelled subsidies from the compelled speech in cases like *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943), and *Wooley* v. *Maynard,* 430 U. S. 705 (1977). It does not follow, however, that the First Amendment is not implicated when a person is forced to subsidize speech to which he objects. *Keller* v. *State Bar of Cal.,* 496 U. S. 1, 13–14

(1990). As we held in *Glickman, Keller,* and a number of other cases, such a compelled subsidy is permissible when it is ancillary, or "germane," to a valid cooperative endeavor. The incremental impact on the liberty of a person who has already surrendered far greater liberty to the collective entity (either voluntarily or as a result of permissible compulsion) does not, in my judgment, raise a significant constitutional issue if it is ancillary to the main purpose of the collective program.

This case, however, raises the open question whether such compulsion is constitutional when nothing more than commercial advertising is at stake. The naked imposition of such compulsion, like a naked restraint on speech itself, seems quite different to me.* We need not decide whether other interests, such as the health or artistic concerns mentioned by JUSTICE BREYER, *post,* at 428, might justify a compelled subsidy like this, but surely the interest in making one entrepreneur finance advertising for the benefit of his competitors, including some who are not required to contribute, is insufficient.

JUSTICE THOMAS, concurring.

I agree with the Court that *Glickman* v. *Wileman Brothers & Elliott, Inc.,* 521 U. S. 457 (1997), is not controlling. I write separately, however, to reiterate my views that "paying money for the purposes of advertising involves speech," and that "compelling speech raises a First Amend-

---

*The Court has held that the First Amendment is implicated by government regulation of contributions and expenditures for political purposes. *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam).* Although it by no means follows that the reasoning in such cases would apply to the regulation of expenditures for advertising, I think it clear that government compulsion to finance objectionable speech imposes a greater restraint on liberty than government regulation of money used to subsidize the speech of others. Even in the commercial speech context, I think it entirely proper for the Court to rely on the First Amendment when evaluating the significance of such compulsion.

ment issue just as much as restricting speech." *Id.*, at 504 (THOMAS, J., dissenting). Any regulation that compels the funding of advertising must be subjected to the most stringent First Amendment scrutiny.

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, and with whom JUSTICE O'CONNOR joins as to Parts I and III, dissenting.

The Court, in my view, disregards controlling precedent, fails properly to analyze the strength of the relevant regulatory and commercial speech interests, and introduces into First Amendment law an unreasoned legal principle that may well pose an obstacle to the development of beneficial forms of economic regulation. I consequently dissent.

I

Only four years ago this Court considered a case very similar to this one, *Glickman* v. *Wileman Brothers & Elliott, Inc.,* 521 U. S. 457 (1997). The issue there, like here, was whether the First Amendment prohibited the Government from collecting a fee for collective product advertising from an objecting grower of those products (nectarines, peaches, and plums). We held that the collection of the fee did not "rais[e] a First Amendment issue for us to resolve," but rather was "simply a question of economic policy for Congress and the Executive to resolve." *Id.*, at 468. We gave the following reasons in support of our conclusion:

> "First, the marketing orders impose no restraint on the freedom of any producer to communicate any message to any audience. Second, they do not compel any person to engage in any actual or symbolic speech. Third, they do not compel the producers to endorse or to finance any political or ideological views." *Id.*, at 469–470.

This case, although it involves mushrooms rather than fruit, is identical in each of these three critical respects. No one, including the Court, claims otherwise. And I believe these similar characteristics demand a similar conclusion.

The Court sees an important difference in what it says is the fact that *Wileman*'s fruit producers were subject to regulation (presumably price and supply regulation) that "'displaced competition,'" to the "extent that they were 'expressly exempted from the antitrust laws.'" *Ante,* at 412 (quoting 521 U. S., at 461). The mushroom producers here, it says, are not "'subjected to a uniform price, . . . restrictio[n] on supply,'" *ante,* at 413 (quoting 197 F. 3d 221, 222, 223 (CA6 1999)), or any other "common venture" that "depriv[es]" them of the "ability to compete," *ante,* at 414. And it characterizes this difference as "fundamental." *Ante,* at 411.

But the record indicates that the difference to which the Court points could not have been critical. The Court in *Wileman* did not refer to the *presence* of price or output regulations. It referred to the fact that Congress had "*authorized*" that kind of regulation. 521 U. S., at 462 (emphasis added). See also *id.,* at 461 (citing agricultural marketing statute while noting that marketing orders issued under its authority "*may* include" price and quantity controls (emphasis added)). Both then-existing federal regulations and JUSTICE SOUTER's dissenting opinion make clear that, at least in respect to some of *Wileman*'s marketing orders, price and output regulations, while "authorized," were not, in fact, in place. See 7 CFR pts. 916, 917 (1997) (setting forth container, packaging, grade, and size regulations, but not price and output regulations); 521 U. S., at 500, n. 13 (SOUTER, J., dissenting) (noting that "the extent to which the Act eliminates competition varies among different marketing orders"). In this case, just as in *Wileman,* the Secretary of Agriculture is *authorized* to promulgate price and supply regulations. See *ante,* at 415 ("greater regula-

tion of the mushroom market might have been implemented under the Agricultural Marketing Agreement Act of 1937"); 7 U. S. C. §§ 608c(2), (6)(A), (7). But in neither case has she actually done so. Perhaps that is why the Court in *Wileman* did not rely heavily upon the existence of the Secretary's authority to regulate prices or output. See 521 U. S., at 469 (noting statutory scheme in passing).

Regardless, it is difficult to understand why the presence or absence of price and output regulations could make a critical First Amendment difference. The Court says that collective fruit advertising (unlike mushroom advertising) was the "logical concomitant" of the more comprehensive "economic" regulatory "scheme." *Ante,* at 412. But it does not explain how that could be so. Producer price-fixing schemes seek to keep prices higher than market conditions might otherwise dictate, as do restrictions on supply. Antitrust exemptions are a "logical concomitant," for otherwise the price or output agreement might be held unlawful. But collective advertising has no obvious comparable connection. As far as *Wileman* or the record here suggests, collective advertising might, or might not, help bring about prices higher than market conditions would otherwise dictate. Certainly nothing in *Wileman* suggests the contrary. Cf. 521 U. S., at 477 (SOUTER, J., dissenting) (criticizing the Court for not requiring advertising program to be "reasonably necessary to implement the regulation").

By contrast, the advertising here relates directly, not in an incidental or subsidiary manner, to the regulatory program's underlying goal of "maintain[ing] and expand[ing] existing markets and uses for mushrooms." 7 U. S. C. § 6101(b)(2). As the Mushroom Act's economic goals indicate, collective promotion and research is a perfectly traditional form of government intervention in the marketplace. Promotion may help to overcome inaccurate consumer perceptions about a product. See Hearings on H. R. 1776 et al. before the Subcommittee on Domestic Marketing, Consumer Relations,

and Nutrition of the House Committee on Agriculture, 101st Cong., 1st Sess., 99 (1989) (hereinafter Hearings) (statement of Rep. Grant) (noting need to overcome consumer fears about safety of eating mushrooms and that per capita mushroom consumption in Canada was twice that of United States). Overcoming those perceptions will sometimes bring special public benefits. See 7 U. S. C. §§ 6101(a)(1)–(3) (mushrooms are "valuable part of the human diet," and their production "benefits the environment"). And compelled payment may be needed to produce those benefits where, otherwise, some producers would take a free ride on the expenditures of others. See Hearings 95–96 (statement of James Ciarrocchi) ("The . . . industry has embarked on several voluntary promotion campaigns over the years. . . . [A] lesson from every one . . . has been unreliability, inefficiency, and inequities of voluntary participation").

Compared with traditional "command and control," price, or output regulation, this kind of regulation—which relies upon self-regulation through industry trade associations and upon the dissemination of information—is more consistent, not less consistent, with producer choice. It is difficult to see why a Constitution that seeks to protect individual freedom would consider the absence of "heavy regulation," *ante,* at 413, to amount to a special, determinative reason for refusing to permit this less intrusive program. If the Court classifies the former, more comprehensive regulatory scheme as "economic regulation" for First Amendment purposes, it should similarly classify the latter, which does not differ significantly but for the comparatively greater degree of freedom that it allows.

The Court invokes in support of its conclusion other First Amendment precedent, namely, *Abood* v. *Detroit Bd. of Ed.,* 431 U. S. 209 (1977), *Keller* v. *State Bar of Cal.,* 496 U. S. 1 (1990), *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943), and *Wooley* v. *Maynard,* 430 U. S. 705 (1977). But those cases are very different. The first two, *Abood* and

*Keller,* involved compelled contributions by employees to trade unions and by lawyers to state bar associations, respectively. This Court held that the compelled contributions were unlawful (1) to the extent that they helped fund subsidiary activities of the organization, *i. e.,* activities *other than* those that legally justified a compelled contribution; and (2) because the subsidiary activities in question were political activities that might "conflict with one's 'freedom of belief.'" *Wileman, supra,* at 471 (quoting *Abood, supra,* at 235). See *Keller, supra,* at 15 (communications involving abortion, prayer in the public schools, and gun control); *Abood, supra,* at 213 (communications involving politics and religion).

By contrast, the funded activities here, like identical activities in *Wileman,* do *not* involve this kind of expression. In *Wileman* we described the messages at issue as incapable of "engender[ing] any crisis of conscience" and the producers' objections as "trivial." 521 U. S., at 471, 472. The messages here are indistinguishable. Compare Brief for Respondent 10–11 (objecting to advertising because it treats branded and unbranded mushrooms alike, associates mushrooms "with the consumption of alcohol and . . . tout[s] mushrooms as an aphrodisiac") with *Wileman, supra,* at 467, n. 10 (dismissing objections to advertising that suggested "'all varieties of California fruit to be of equal quality,'" and included "'sexually subliminal messages as evidenced by an ad depicting a young girl in a wet bathing suit'") (quoting District Court opinion). See also Appendix, *infra.* The compelled contribution here relates directly to the regulatory program's basic goal.

Neither does this case resemble either *Barnette* or *Wooley.* *Barnette* involved compelling children, contrary to their conscience, to salute the American flag. 319 U. S., at 632. *Wooley* involved compelling motorists, contrary to their conscience, to display license plates bearing the State's message "Live Free or Die." 430 U. S., at 707. In *Wileman*

we found *Barnette* and *Wooley,* and *all* of "our compelled speech case law . . . clearly inapplicable" to compelled financial support of generic advertising. 521 U. S., at 470. See also *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S. 626, 651 (1985) (refusing to apply *Wooley* and *Barnette* in a commercial context where "the interests at stake in this case are not of the same order"). We explained:

> "The use of assessments to pay for advertising does not require respondents to repeat an objectionable message out of their own mouths, cf. *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 632 (1943), require them to use their own property to convey an antagonistic ideological message, cf. *Wooley* v. *Maynard,* 430 U. S. 705 (1977); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.,* 475 U. S. 1, 18 (1986) (plurality opinion), force them to respond to a hostile message when they 'would prefer to remain silent,' see *ibid.,* or require them to be publicly identified or associated with another's message, cf. *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, 88 (1980). Respondents are . . . merely required to make contributions for advertising." *Wileman, supra,* at 470–471.

These statements are no less applicable to the present case. How can the Court today base its holding on *Barnette, Wooley, Abood,* and *Keller*—the very same cases that we expressly distinguished in *Wileman?*

## II

Nearly every human action that the law affects, and virtually all governmental activity, involves speech. For First Amendment purposes this Court has distinguished among contexts in which speech activity might arise, applying special speech-protective rules and presumptions in some of those areas, but not in others. See, *e. g., Board of Regents*

*of Univ. of Wis. System* v. *Southworth,* 529 U. S. 217, 229 (2000) (indicating that less restrictive rules apply to governmental speech); *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557, 564 (1980) (commercial speech subject to "mid-level" scrutiny); *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U. S. 563, 568 (1968) (applying special rules applicable to speech of government employees). Were the Court not to do so—were it to apply the strictest level of scrutiny in every area of speech touched by law—it would, at a minimum, create through its First Amendment analysis a serious obstacle to the operation of well-established, legislatively created, regulatory programs, thereby seriously hindering the operation of that democratic self-government that the Constitution seeks to create and to protect. Cf. Post, The Constitutional Status of Commercial Speech, 48 UCLA L. Rev. 1, 9–10 (2000).

That, I believe, is why it is important to understand that the regulatory program before us is a "species of economic regulation," *Wileman,* 521 U. S., at 477, which does not "warrant special First Amendment scrutiny," *id.,* at 474. Irrespective of *Wileman* I would so characterize the program for three reasons.

First, the program does not significantly interfere with protected speech interests. It does not compel speech itself; it compels the payment of money. Money and speech are not identical. Cf. *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 388–389 (2000); *id.,* at 398 (STEVENS, J., concurring) ("Money is property; it is not speech"); *id.,* at 400 (BREYER, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech"). Indeed, the contested requirement— that individual producers make a payment to help achieve a governmental objective—resembles a targeted tax. See *Southworth,* 529 U. S., at 241 (SOUTER, J., joined by STEVENS

and BREYER, JJ., concurring in judgment) ("[T]he university fee at issue is a tax"). And the "government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties." *Id.*, at 229 (majority opinion). Cf. *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 547 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes").

Second, this program furthers, rather than hinders, the basic First Amendment "commercial speech" objective. The speech at issue amounts to ordinary product promotion within the commercial marketplace—an arena typically characterized both by the need for a degree of public supervision and the absence of a special democratic need to protect the channels of public debate, *i. e.*, the communicative process itself. Cf. Post, *supra*, at 14–15. No one here claims that the mushroom producers are restrained from contributing to a public debate, moving public opinion, writing literature, creating art, invoking the processes of democratic self-government, or doing anything else more central to the First Amendment's concern with democratic self-government.

When purely commercial speech is at issue, the Court has described the First Amendment's basic objective as protection of the consumer's interest in the free flow of truthful commercial information. See, *e. g.*, *Edenfield* v. *Fane*, 507 U. S. 761, 766 (1993) ("First Amendment coverage of commercial speech is designed to safeguard" society's "interes[t] in broad access to complete and accurate commercial information"); *Zauderer, supra*, at 651 ("[T]he extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information"); *Central Hudson, supra*, at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising"); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 783 (1978) ("A commercial advertisement is constitutionally protected not so much

because it pertains to the seller's business as because it furthers the societal interest in the 'free flow of commercial information'") (quoting *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 764 (1976)). Unlike many of the commercial speech restrictions this Court has previously addressed, the program before us promotes the dissemination of truthful information to consumers. And to sustain the objecting producer's constitutional claim will likely make less information, not more information, available. Perhaps that is why this Court has not previously applied "compelled speech" doctrine to strike down laws requiring provision of additional commercial speech.

Third, there is no special risk of other forms of speech-related harm. As I have previously pointed out, and *Wileman* held, there is no risk of significant harm to an individual's conscience. *Supra*, at 423–424. The program does not censor producer views unrelated to its basic regulatory justification. *Supra*, at 420–421. And there is little risk of harming any "discrete, little noticed grou[p]." *Ante*, at 410. The Act excludes small producers, 7 U. S. C. §§ 6102(6), (11) (exempting those who import or produce less than 500,000 pounds of mushrooms annually)—unlike respondent, a large, influential corporation. The Act contains methods for implementing its requirements democratically. See §§ 6104(b) (1)(B), (g)(2) (Mushroom Council, which sets assessment rate, is composed entirely of industry representatives); §§ 6105(a), (b) (referendum required before Secretary of Agriculture's order can go into effect and five years thereafter, and producers may request additional referenda). And the Act provides for supervision by the Secretary. § 6104(d)(3) (requiring Secretary to approve all advertising programs). See also *Wileman,* 521 U. S., at 477 (refusing to upset "the judgment of the majority of market participants, bureaucrats, and legislators who have concluded that [collective advertising] programs are beneficial"). These safeguards protect

against abuse of the program, such as "making one entrepreneur finance advertising for the benefit of his competitors." *Ante*, at 418 (STEVENS; J., concurring). Indeed, there is no indication here that the generic advertising promotes some brands but not others. And any "debat[e]" about branded versus nonbranded mushrooms, *ante*, at 411 (majority opinion), is identical to that in *Wileman*. *Supra*, at 423–424.

Taken together, these circumstances lead me to classify this common example of government intervention in the marketplace as involving a form of economic regulation, not "commercial speech," for purposes of applying First Amendment presumptions. And seen as such, I cannot find the program lacks sufficient justification to survive constitutional scrutiny. *Wileman*, *supra*, at 476–477.

The Court, in applying stricter First Amendment standards and finding them violated, sets an unfortunate precedent. That precedent suggests, perhaps requires, striking down any similar program that, for example, would require tobacco companies to contribute to an industry fund for advertising the harms of smoking or would use a portion of museum entry charges for a citywide campaign to promote the value of art. Moreover, because of its uncertainty as to how much governmental involvement will produce a form of immunity under the "government speech" doctrine, see *ante*, at 417, the Court infects more traditional regulatory requirements—those related, say, to warranties or to health or safety information—with constitutional doubt.

Alternatively, the Court's unreasoned distinction between heavily regulated and less heavily regulated speakers could lead to less First Amendment protection in that it would deprive the former of protection. But see *Consolidated Edison Co. of N. Y. v. Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 534, n. 1 (1980) (Even "heavily regulated businesses may enjoy constitutional protection") (citing, as an example, *Virginia Bd. of Pharmacy*, *supra*, at 763–765).

At a minimum, the holding here, when contrasted with that in *Wileman*, creates an incentive to increase the Government's involvement in any information-based regulatory program, thereby unnecessarily increasing the degree of that program's restrictiveness. I do not believe the First Amendment seeks to limit the Government's economic regulatory choices in this way—any more than does the Due Process Clause. Cf. *Lochner* v. *New York*, 198 U. S. 45 (1905).

### III

Even if I were to classify the speech at issue here as "commercial speech" and apply the somewhat more stringent standard set forth in the Court's commercial speech cases, I would reach the same result. That standard permits restrictions where they "directly advance" a "substantial" government interest that could not "be served as well by a more limited restriction." *Central Hudson*, 447 U. S., at 564. I have already explained why I believe the Government interest here is substantial, at least when compared with many typical regulatory goals. *Supra*, at 422. It remains to consider whether the restrictions are needed to advance its objective.

Several features of the program indicate that its speech-related aspects, *i. e.*, its compelled monetary contributions, are necessary and proportionate to the legitimate promotional goals that it seeks. At the legislative hearings that led to enactment of the Act, industry representatives made clear that pre-existing efforts that relied upon voluntary contributions had not worked. Thus, compelled contributions may be necessary to maintain a collective advertising program in that rational producers would otherwise take a free ride on the expenditures of others. See *ibid.; Abood*, 431 U. S., at 222 (relying upon "free rider" justification in union context).

At the same time, those features of the program that led *Wileman*'s dissenters to find its program disproportionately restrictive are absent here. *Wileman*'s statutory scheme covered various different agricultural commodities and imposed a patchwork of geographically based limitations while "prohibit[ing] orders of national scope"—all for no apparent reason. 521 U. S., at 499 (SOUTER, J., dissenting). The law at issue here, however, applies only to mushrooms, and says explicitly that "[a]ny" mushroom order "shall be national in scope." 7 U. S. C. § 6103(a). Cf. *Wileman, supra,* at 493 (SOUTER, J., dissenting) ("[I]f the Government were to attack these problems across an interstate market for a given agricultural commodity or group of them, the substantiality of the national interest would not be open to apparent question . . .").

Nor has the Government relied upon "[m]ere speculation" about the effect of the advertising. *Wileman, supra,* at 501 (SOUTER, J., dissenting). Rather, it has provided empirical evidence demonstrating the program's effect. See Food Marketing & Economics Group, Mushroom Council Program Effectiveness Review, 1999, p. 6 (Feb. 2000), lodging for United States (available in Clerk of Court's case file) (finding that "for every million dollars spent by the Mushroom Council . . . the growth rate [of mushroom sales] increases by 2.1%"). In consequence, whatever harm the program may cause First Amendment interests is proportionate. Cf. *Bartnicki* v. *Vopper,* 532 U. S. 514, 535 (2001) (BREYER, J., concurring).

The Court's decision converts "a question of economic policy for Congress and the Executive" into a "First Amendment issue," contrary to *Wileman.* 521 U. S., at 468 (internal quotation marks and citation omitted). Nor can its holding find support in basic First Amendment principles.

For these reasons, I dissent.

[Appendix to opinion of BREYER, J., follows this page.]