

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2004

# ANN VENEMAN, Secretary, U.S. Department of Agriculture,NATIONAL DAIRY PROMOTION BOARD

Precedential or Non-Precedential: Precedential

Docket No. 03-2522

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"ANN VENEMAN, Secretary, U.S. Department of Agriculture,NATIONAL DAIRY PROMOTION BOARD" (2004). *2004 Decisions*.
Paper 940.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/940

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-2522

———

JOSEPH S. COCHRAN;
BRENDA S. COCHRAN,

Appellants

v.

ANN VENEMAN, Secretary, U.S.
Department of Agriculture;
NATIONAL DAIRY PROMOTION
BOARD

Appellees

And

FRED LOVELL; LEE GREENWALT;
JACKIE ROOT; EARNEST NORMAN;
STEPHEN MASHALL; CECIL
MOYER; JAMES VANBLARCOM

Intervenors-Appellees

———

Appeal from the United States District
Court for the Middle District of
Pennsylvania

(D.C. Civil No. 02-cv-00529)

District Judge:
Honorable John E. Jones, III

———

Argued: January 12, 2004

Before: Sloviter, Rendell and Aldisert,
Circuit Judges.

(Filed: February 24, 2004)

———

Steven M. Simpson (Argued)
Institute for Justice
1717 Pennsylvania Ave., N.W. Suite 200
Washington, DC 20006

Walter T. Grabowski
Holland, Grady & Grabowski
61 North Washington Street
Wilkes-Barre, PA 18701

ATTORNEY FOR APPELLANTS

Thomas A. Marino,
United States Attorney
Matthew M. Collette (Argued)
Douglas N. Letter
Attorneys, Appellate Staff
Civil Division, Room 9008
Department of Justice
Washington, D.C. 20530-0001

ATTORNEY FOR APPELLEES

Richard T. Rossier (Argued)
Alex Mendez
McLeon, Watkinson & Miller
One Massachusetts Ave. N.W. Suite 800
Washington, D.C. 20001

ATTORNEY FOR INTERVENORS-
APPELLEES

## OPINION OF THE COURT

ALDISERT, <u>Cicuit Judge</u>.

The American public is very familiar with the "Got Milk? ®" ads on television and in the print media.

This appeal requires us to decide whether a federal statute may compel a small dairy farm in Pennsylvania to help pay for the white-mustache milk advertisements and other dairy promotions. Implicated here are general First Amendment precepts that protect the right to refrain from speaking and the right to refrain from association, and the specific issue of whether the government may compel individuals to fund speech with which they disagree.

Joseph and Brenda Cochran are independent small-scale dairy farmers. They are not members of any dairy manufacturing or marketing cooperative. They alone determine how much milk to produce, how to sell and market it and to whom it will be sold.

The Dairy Promotion Stabilization Act of 1983, 7 U.S.C. § 4501 <u>et seq.</u> ("Dairy Promotion Act," "Dairy Act," or "Act"), provides for the creation of the Dairy Promotion Program and authorizes the Secretary of the Department of Agriculture ("Secretary") to issue an order creating the National Dairy Promotion and Research Board ("Dairy Board") to administer the program. To finance the promotional projects and the Dairy Board's administration of them, the Dairy Act and implementing order require every milk producer in the United States to pay mandatory assessments of 15 cents per hundredweight of milk sold.[1] <u>Id.</u> § 4504(g); 7 C.F.R. § 1150.152. Neither the Dairy Act nor the order permits dissenting milk producers to withhold contributions for advertising or promotional projects to which they object.

The Cochrans object to paying these assessments and filed an action in the

---

[1] The Dairy Act provides:

> The order shall provide that each person making payment to a producer for milk produced in the United States and purchased from the producer shall . . . collect an assessment based upon the number of hundredweights of milk for commercial use handled for the account of the producer and remit the assessment to the Board.
> . . .
> The rate of assessment for milk . . . prescribed by the order shall be 15 cents per hundredweight of milk for commercial use or the equivalent thereof, as determined by the Secretary.

7 U.S.C. § 4504(g).

United States District Court for the Middle District of Pennsylvania seeking a declaration that the Dairy Act violates their First Amendment rights of free speech and association.

The Cochrans operate a small commercial dairy farm with approximately 150 cows on about 200 acres of land in Tioga County, north-central Pennsylvania. In contrast to many larger-scale commercial dairy farms, the Cochrans employ what is known as "traditional" methods of dairy farming. Traditional dairy farming is less aggressive than larger-scale commercial farming, as it allows cows more room to move and graze and does not use the recombinant Bovine Growth Hormone (rBGH).[2] The Cochrans believe that their methods result in healthier cows, a cleaner environment and superior milk. The Cochrans object to the advertising under the Dairy Act because it conveys a message that milk is a generic product that bears no distinction based on

---

[2] rBGH, also known as recombinant bovine somatotropin (rBST), is a genetically engineered growth hormone administered to dairy cows to boost milk production. Although the Food and Drug Administration has approved the use of rBGH for dairy production in the United States, consumer advocates and small dairy producers have questioned the longterm effects of the growth hormone on humans, cows and the environment. See Barnes v. Shalala, 865 F. Supp. 550, 554 (W.D. Wis. 1994).

where and how it is produced, and thereby forces them to subsidize speech with which they disagree.

As the First Amendment may prevent the government from prohibiting speech, it may also prevent the government from compelling individuals to express certain views, Wooley v. Maynard, 430 U.S. 705, 714 (1977); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943), or pay subsidies for speech to which individuals object, Keller v. State Bar of California, 496 U.S. 1, 9-10 (1990); Abood v. Detroit Dep't of Educ., 431 U.S. 209, 234 (1977).

The Cochrans' lawsuit named as defendants Ann Veneman in her official capacity as Secretary of the United States Department of Agriculture ("USDA") and the National Dairy Promotion Board, and sought declaratory and injunctive relief from the remittance of compelled assessments by all dairy producers to finance generic dairy advertisements. Alleging that the Dairy Act unconstitutionally compels them to subsidize speech with which they disagree, the Cochrans filed a motion for summary judgment contending that their case was controlled by the teachings of United States v. United Foods, Inc., 533 U.S. 405 (2001), in which the Supreme Court held that compelled subsidies under the Mushroom Promotion, Research, and Consumer Information Act of 1990 ("Mushroom Act"), 7 U.S.C. § 6101 et seq., violated First Amendment protections.

The Government filed a motion to

3

dismiss or, in the alternative, for summary judgment, arguing that this case is controlled by the teachings of <u>Glickman v. Wileman Brothers & Elliot, Inc.</u>, 521 U.S. 457 (1997), in which the Supreme Court upheld compelled subsidies for advertising California tree fruit under two marketing orders issued pursuant to the Agricultural Marketing and Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 608c <u>et seq</u>. The Government argued that the generic dairy advertising subsidized under the Dairy Act constitutes "government speech" and is therefore immune from First Amendment scrutiny and, moreover, that the Dairy Act is a species of economic regulation that does not violate the First Amendment.[3] The district court agreed with the Government and granted summary judgment in its favor, holding that the Dairy Act survives the deferential First Amendment scrutiny afforded to economic regulation. The Cochrans appeal.

We must decide whether the challenged communications pursuant to the Dairy Act are government speech and thereby immune from First Amendment

---

[3] Seven Pennsylvania dairy farmers who support the Dairy Promotion Act and Program petitioned the district court for leave to intervene as defendants and the district court granted the petition for intervention under Rule 24(a) of the Federal Rules of Civil Procedure. The Intervenors filed a cross motion for summary judgment, echoing the arguments made by the Government in its motion.

scrutiny. If these communications are private speech, we must decide whether the Dairy Act violates the First Amendment free speech and association rights of dairy farmers. In doing so, we must consider the quantum of scrutiny to be applied to determine the validity of regulations, such as the Dairy Act, that compel commercial speech.

For the reasons that follow we reverse the judgment of the district court and hold that the compelled speech pursuant to the Dairy Act is private speech, not government speech, and is therefore subject to First Amendment scrutiny. We hold also that the Act violates the Cochrans' First Amendment free speech and association rights by compelling them to subsidize speech with which they disagree. In so doing we conclude that the subsequent Supreme Court decisions of <u>Glickman</u> in 1997 and <u>United Foods</u> in 2001 severely dilute the precedential vitality of our ultimate holding in <u>United States v. Frame</u>, 885 F.2d 1119 (3d Cir. 1989), in which we concluded that the compelled assessments pursuant to the Beef Promotion Research Act of 1985, 7 U.S.C. § 2901 <u>et seq.</u>, survived First Amendment scrutiny.

I.

In determining the side on which the axe must fall – on <u>Glickman</u> or on <u>United Foods</u> – we must start by examining why the Supreme Court went one way in its first case of <u>Glickman</u> and the other way in its subsequent decision in <u>United Foods</u>.

A.

In Glickman, producers of California tree fruits (including nectarines, plums and peaches) challenged the constitutionality of regulations contained in marketing orders promulgated by the Secretary pursuant to the AMAA, 7 U.S.C. § 608c et seq., that imposed mandatory assessments on fruit tree growers to cover the expenses associated with the marketing orders, including the costs of generic advertising. 521 U.S. at 460. The Court emphasized that besides the advertising decisions, the economic autonomy of the fruit tree growers was otherwise restricted by a broader collective arrangement set forth in the marketing orders:

> California nectarines and peaches are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme.

Id. at 469.

In addition to advertising, the marketing orders for California fruit tree growers provided for mechanisms for establishing uniform prices, limiting the quality and quantity of tree fruit that could be marketed, determining the grade and size of the fruit and orderly disposing of any surplus. Id. at 461. The orders also authorized joint research and development projects, quality inspection procedures and standardized packaging requirements – all of which were financed by the compelled assessments. Id.

The Court determined that the collective arrangement of the fruit tree farmers was similar to the union arrangement at issue in Abood v. Detroit Board of Education, 431 U.S. 209 (1977), and the bar association at issue in Keller v. State Bar of California, 496 U.S. 1 (1990). In Abood, the Court held that the infringement upon First Amendment associational rights by compelled assessments for a union shop arrangement was "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." 431 U.S. at 222. Similarly, in Keller, the Court held that the infringement upon First Amendment associational rights by compelled assessments for a state bar program was constitutionally justified by the State's interest in regulating the legal profession and improving the quality of legal services. 496 U.S. at 13. Finding parallels between the facts of Abood and Keller, in Glickman the Court concluded that as part of the AMAA marketing

5

orders, the compelled assessments for generic advertising of California tree fruit were ancillary to a comprehensive marketing program, and therefore were "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." 521 U.S. at 477.

"The opinion and the analysis of the Court [in Glickman] proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation." United Foods, 533 U.S. at 412.

### B.

Four terms later, in United Foods the Court held that mandatory assessments imposed on mushroom producers for the purpose of funding generic mushroom advertising under the Mushroom Act, 7 U.S.C. § 6101 et seq., violated the First Amendment. 533 U.S. at 416. The Court distinguished the statutory context at issue in United Foods from that in Glickman, explaining that under the stand-alone Mushroom Act "the compelled contributions for advertising are not part of some broader regulatory scheme" and the advertising was itself the "principal object" of the Mushroom Act. Id. at 415. As such, "the mandated support is contrary to the First Amendment principles set forth in

cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity." Id. at 413 (citing Abood, 431 U.S. at 209; Keller, 496 U.S. at 1). The Court concluded that the compelled assessments pursuant to the Mushroom Act were unlike the situation in Abood, Keller and Glickman, in which:

> Those who were required to pay a subsidy for the speech of the association already were required to associate for other purposes, making the compelled contribution of moneys to pay for expressive activities a necessary incident of a larger expenditure for an otherwise proper goal requiring the cooperative activity.

Id. at 414.

Fundamentally, the Court noted that "[w]e have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself." Id. at 415. Concluding that the only program the compelled contributions for advertising pursuant to the Mushroom Act serve "is the very advertising scheme in question," the Court ruled that the compelled assessments were not permitted under the First Amendment. Id. at 416.

### C.

Guided by the express reasoning of the Court in Glickman and United Foods, we must first look at the broader statutory scheme presented in the Dairy

Act, or more specifically, we must ascertain whether the dairy producers are "bound together and required by the statute to market their products according to cooperative rules" for purposes other than advertising, or speech. United Foods, 533 U.S. at 412. It is to a description of the Dairy Act we now turn.

## II.

The Dairy Promotion Program set forth in the Dairy Act is one in a long series of federal "checkoff" programs for promoting agricultural commodities.[4]

---

[4]Other stand-alone checkoff programs established by Congress which have been subject to First Amendment challenges include: Beef Research and Information Act of 1976 ("Beef Act"), 7 U.S.C. § 2901 et seq. (invalidated by Livestock Marketing Ass'n v. U.S. Dep't of Agric., 335 F.3d 711 (8th Cir. 2003) (reh'g den. Oct. 16, 2003)); Pork Promotion, Research, and Consumer Information Act of 1985 ("Pork Act"), 7 U.S.C. § 4801 et seq. (invalidated by Michigan Pork Producers Ass'n, Inc. v. Veneman, 348 F.3d 157 (6th Cir. 2003)); Mushroom Act, 7 U.S.C. § 6101 et seq. (invalidated in 2001 by United Foods, 533 U.S. at 405). Cf. Glickman, 521 U.S. at 457 (upholding as constitutional marketing orders for California tree fruits promulgated pursuant to the AMAA, 7 U.S.C. § 608c et seq., which included compelled assessments to fund, among

Enacted in 1983, the Dairy Act authorizes the Secretary of Agriculture to establish a program for the "advertisement and promotion of the sale and consumption of dairy products [and] for research projects related thereto." 7 U.S.C. § 4504(a). The declared purpose of the Dairy Act is to provide for "an orderly procedure for financing . . . and carrying out a coordinated program of promotion designed to strengthen the dairy industry's position in the marketplace . . . ." Id. § 4501(b).

The Dairy Act is a stand-alone law that was not passed as part of any other federal dairy regulatory scheme. It directs the Secretary to appoint a Dairy Board composed of private milk producers to administer the Dairy Promotion Program. Id. §§ 4504 (b) & (c). The Act provides that every milk producer must pay a mandatory assessment of 15 cents per hundredweight of milk sold to finance the promotional programs and the Dairy Board's administration of them.

Pursuant to the authority provided in 7 U.S.C. § 4503(a), the Secretary issued an order in March 1984 establishing the Dairy Board, 7 C.F.R § 1150.131, and the Board proceeded to collect the mandatory assessments from all milk producers, 7 C.F.R § 1150.152. For the Cochrans, the compelled assessments amount to roughly $3,500 to $4,000 per year.

---

other things, generic advertising).

7

The Dairy Board is composed of commercial milk producers who are nominated by "eligible associations," which are private associations of milk producers that engage in dairy promotion at the state and regional level. Id. §§ 1150.133, 1150.273. The primary consideration in determining an organization's eligibility is "whether its membership consists primarily of milk producers who produce a substantial volume of milk" and whose overriding interests lay in the production and promotion of fluid milk and other dairy products. Id. § 1150.274(b).

In 1994, the Dairy Board created Dairy Management, Inc. ("DMI"), a District of Columbia corporation that now oversees and administers the promotional activities of the Dairy Act. DMI is a joint undertaking of the Dairy Board and the United Dairy Industry Association ("UDIA"), which is an association of state and regional dairy promotional programs that are considered "Qualified Programs" under the Dairy Act. "Qualified Programs" are local promotional programs, many of which preexisted the Dairy Act, to which milk producers may contribute a portion of the money they would otherwise pay in assessments under the Act. See 7 U.S.C. § 4504(g)(4), 7 C.F.R. §§ 1150.152(c), 1150.153. The Act thus requires dairy farmers to pay either the full 15 cent per hundredweight assessment to the Dairy Program or part to the Dairy Program and part to a Qualified Program that engages in state or regional generic advertising. The

Dairy Board and the DMI Board are composed entirely of private milk producers and other private parties, and the Dairy Promotion Program is funded entirely by private milk producers through the compelled assessments. The Dairy Promotion Program website explains: "Checkoff programs are funded by dairy producers – NOT TAXPAYERS. They are not governmental programs; rather, they are businesses with governmental oversight."[5]

The Secretary's oversight responsibilities pursuant to the Dairy Act are conducted by the Agricultural Marketing Service ("AMS"), a division of the USDA, and are limited to ensuring that the Dairy Promotion Program is in compliance with the Act. See, e.g., 7 U.S.C. § 4507(a) (authorizing the Secretary to terminate an order issued under the Act only when she determines that it "obstructs or does not tend to effectuate the declared policy of" the Act). AMS guidelines explain that "[i]t is the policy of AMS in carrying out the oversight responsibility to ensure that legislative, regulatory, and Department policy requirements are met. It is not the intent to impose constraints on board operations beyond these requirements." AMS, Guidelines for AMS Oversight of Commodity Research and Promotion

_____

[5] Dairy checkoff Works! – How the Dairy Checkoff works, available at http://www.dairycheckoff.com/howitworks. htm (last visited June 3, 2002 (J.A. at 231)).

8

Programs 1 (1994). The Secretary's oversight functions for the Dairy Program are funded by the compelled assessments. 7 U.S.C. § 4504(g)(2); 7 C.F.R. § 1150.151(b). Moreover, the dairy producers, not the government, control whether the Dairy Promotion Program continues via a referendum process. 7 U.S.C. § 4506(a).

All advertising and promotional programs that are financed by the compelled assessments under the Dairy Act and created by the Dairy Board and DMI promote milk as a generic product. 7 C.F.R. § 1150.114. Among advertising campaigns financed by the Dairy Promotion Program are "Got milk? ®" and "Ahh, the power of cheese."

### III.

In addition to the Dairy Act, the dairy industry is subject to a patchwork of federal and state regulatory laws. The district court noted four federal laws in particular that it deemed relevant to this case: (1) the Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 608c et seq.; (2) the Agriculture Act of 1949, 7 U.S.C. § 1446; (3) import control regulations under 19 U.S.C. § 1202; and (4) the Capper-Volstead Act, 7 U.S.C. § 291.

An examination of the provisions of these statutes is crucial to determine whether these legislative acts, in conjunction with the Dairy Act, bring the case at bar within the rubric of Glickman – i.e., requiring that milk producers are

bound together and obligated by statute to market their products according to some set of cooperative rules. The district court held that such a cooperative arrangement exists for dairy producers, but we conclude otherwise.

### A.

The AMAA, 7 U.S.C § 608c, permits the Secretary to issue marketing orders that regulate the handling and sales of various agricultural commodities, including milk, in different regions of the country. For milk, the marketing orders establish a classification system and set minimum prices that handlers must pay in the regions in which the orders apply. See 7 U.S.C. § 608c(5); 7 C.F.R. § 1000.1 et seq. The AMAA applies only to "handlers"[6] of the covered commodities. 7 U.S.C. §§ 608c(1) & (5)(A). "Producers," such as dairy farmers in general, and Joseph and Brenda Cochran in particular, are specifically exempted from the application of marketing orders. Id. § 608c(13)(B) (stating that no marketing order "shall be applicable to any producer in his capacity as a producer").

Although milk marketing orders restrict the decisions of dairy handlers, they do not interfere with the decisions of dairy producers, such as the Cochrans,

---

[6]A handler is a person who purchases milk from a producer in an unprocessed form for the purpose of processing it.

9

with regard to how much milk to produce, sell or whether they must sell milk at all to dairy handlers.  See id. § 608c(5).[7]  At least 25 percent of the milk sold in the United States is sold outside of federal milk marketing orders.  The Cochrans are able to and do sell much of their milk outside any milk marketing order.

### B.

The Agricultural Act of 1949, 7 U.S.C. § 1446, establishes a price support program wherein manufacturers and processors of cheese, nonfat dry milk and butter can sell those products to the federal government as buyer of last resort.  Producers of fluid milk, such as

the Cochrans, however, are not covered by the Agricultural Act and are not permitted to sell their product to the government under the price support program.

### C.

Similarly, the import control regulations under Chapter 4 of the Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202, subject a multitude of commodities and products to annual import quotas.  Although certain dairy products are included – namely butter, dry milk and cheese – fluid milk is not.  See 7 C.F.R. Pt. 6, Apps. 1, 2, 3.

### D.

Finally, the Capper-Volstead Act, 7 U.S.C. § 291, permits producers of agricultural products – including milk, mushrooms and others – to enter into manufacturing and marketing cooperatives without fear of violating antitrust laws.   It does not, however, require producers to enter into such cooperatives, as federal law expressly protects producers' freedom not to join any cooperative.  See Agricultural Fair Practices Act of 1967, 7 U.S.C. § 2301 et seq.; Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd., 467 U.S. 461, 477-478 (1984).  The Cochrans do not belong to any cooperatives protected by the antitrust exemption created by the Capper-Volstead Act.

### E.

---

[7] Milk marketing orders under the AMAA are implemented on a regional basis.  See 7 U.S.C. § 608c(11).  Not all parts of the country are covered, and some states – including California, Virginia, Maine and Montana – are outside the territory of any milk marketing order.  Portions of Pennsylvania fall within two different milk marketing regions, the Northeast Area and the Mideast Area.  See 7 C.F.R. §§ 1001.1, 1033.1.  Certain portions of the state, however, including where the Cochrans are located, fall outside of any federal milk marketing order.  The effect of the AMAA provisions is that any particular producer's milk is subject to a marketing order only if the producer chooses to sell to a regulated handler in an area covered by a marketing order.  See id. §§ 1001.13, 1033.13.

10

Considering the foregoing provisions of the Dairy Act and other statutes governing the dairy industry, we now turn to the First Amendment issues that constitute the heart of this appeal.[8]

IV.

We must first consider whether the compelled assessments generated under the Dairy Act constitute private or government speech. Although the district court did not address this issue, the Government contended before the district court that the expressions generated under the Dairy Act constitute government speech. Therefore, the issue is subject to our review.

The First Amendment prohibits the government from regulating private speech based on its content, but the Court has "permitted the government to regulate the content of what is or is not

expressed when [the government] is the speaker or when [the government] enlists private entities to convey its own message." Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 833 (1995).

The Court has not decided whether speech generated under commodity promotion laws such as the Dairy Act constitutes government speech and is thereby immune from First Amendment scrutiny.[9] But in Frame, this court did meet the issue. 885 F.2d at 1132-1133.

In line with our sister Courts of Appeals in Michigan Pork Producers Ass'n, Inc. v. Veneman, 348 F.3d 157, 161-162 (6th Cir. 2003) and Livestock Marketing Ass'n v. U.S. Dep't of Agric., 335 F.3d 711, 720 (8th Cir. 2003), we held that the Beef Promotion Program was not government speech because it required only beef producers to fund it and it attributed the advertising under the program to the beef producers. Frame, 885 F.2d at 1132-1133. Recognizing that the Beef Promotion Program directed the

---

[8] The United States District Court for the Middle District of Pennsylvania had jurisdiction pursuant to 28 U.S.C. § 1331 based on the Cochrans' First Amendment claim. We have jurisdiction in this timely appeal pursuant to 28 U.S.C. §§ 1291. We review de novo the constitutionality of an Act of Congress. Dyszel v. Marks, 6 F.3d 116, 123 (3d Cir. 1993). Similarly, our review of the district court's granting of judgment on the pleadings and summary judgment is plenary. Anker Energy Corp. v. Consolidation Coal Co., 177 F.3d 161, 169 (3d Cir. 1999).

[9] The two decisions of the Court involving commodity promotion programs do not address the issue of government speech. In Glickman, the Secretary of Agriculture waived the issue by not pursuing it before the Supreme Court. 521 U.S. at 482 n.2 (Souter, J., dissenting). In United Foods, the Court refused to address the issue because the government failed to raise it before the Court of Appeals. 533 U.S. at 416-417.

11

Secretary to appoint all Cattlemen Board members and approve all budgets, plans, contracts and projects entered into by the Board, this court nevertheless concluded that "[t]he Secretary's extensive supervision . . . does not transform this self-help program for the beef industry into 'government speech.'" We explained:

> The Cattlemen's Board seems to be an entity "representative of one segment of the population, with certain common interests." Members of the Cattlemen's Board and the Operating Committee, though appointed by the Secretary, are not government officials, but rather, individuals from the private sector. The pool of nominees from which the Secretary selects Board members, moreover, are determined by private beef industry organizations from the various states. Furthermore, the State organizations eligible to participate in Board nominations are those that "have a history of stability and permanency," and whose "primary or overriding purpose is to promote the economic welfare of cattle producers."

Id. at 1133 (quoting 7 U.S.C. § 2905(b)(3) & (4)). The government's role in the Dairy Promotion Program is in all material respects the same as it was in the Beef Promotion Program, and under the precedent established in Frame, the

Secretary's supervisory responsibilities are not sufficient to transform the dairy industry's self-help program into "government speech." On the dairy checkoff website, the government itself describes the Dairy Promotion Program as a non-governmental program, financed and directed by dairy farmers.

Although this court's First Amendment discussion and ultimate holding in Frame have been abrogated by Glickman and United Foods, none of the Court's subsequent decisions regarding "government speech" undermine our analysis of that issue in Frame.[10]

_____

[10]Notwithstanding the Government's assertions to the contrary, we are not convinced that any decisions rendered by the Court in the years following our decision in Frame require us to cast aside the government speech analysis we performed in Frame. See Legal Servs. Corp. v. Velazquez, 531 U.S. 533 (2001) (concluding that restrictions placed on the private speech of a lawyer receiving government funding from the Legal Services Corporation were unconstitutional); Bd. of Regents of the Univ. of Wis. Sys. v. Southworth, 529 U.S. 217 (2000) (stating in dicta, in a case where the government affirmatively disavowed any connection to the speech involved, that a government speech analysis might apply if a state university used general tuition money to fund speech attributed to the school or its administrators); Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374

12

Accordingly, we conclude that this is a private speech case, and thus is not immune from First Amendment scrutiny.

## V.

The teachings of United Foods require us to decide whether the dairy producers are "bound together and required by the statute to market their products according to cooperative rules[,]" 533 U.S. at 412, for purposes other than advertising, or speech. That is our next task.

The Cochrans contend that the Dairy Act violates their First Amendment free speech and association rights by compelling them to subsidize generic advertising that promotes milk produced by methods they view as wasteful and harmful to the environment.

The First Amendment protects the right to refrain from speaking and the right to refrain from association. See, e.g., Wooley, 430 U.S. at 714. Moreover, the government may not compel individuals to fund speech or

---

(1995) (holding that Amtrak is a government actor for First Amendment purposes because it was created by statute to further government objectives and the government maintained substantial control over its daily operations); Rust v. Sullivan, 511 U.S. 173 (1991) (concluding that the government can prevent private doctors at family planning clinics that receive federal funding from providing abortion counseling).

expressive associations with which they disagree. See United Foods, 533 U.S. at 411. "First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors . . . . As a consequence, the compelled funding for the advertising must pass First Amendment scrutiny." Id. The individual's disagreement can be minor, as "[t]he general rule is that the speaker and the audience, not the government, assess the value of the information presented." Id. (quoting Edenfield v. Fane, 507 U.S. 761, 767 (1993)). When, however, regulation compelling funding for speech is ancillary to a broader collective enterprise that otherwise restricts the individual's market autonomy, it is considered "economic regulation," which enjoys a "strong presumption of validity" when facing a First Amendment challenge. See Glickman, 521 U.S. at 477.

We conclude that in upholding as constitutional the compelled subsidies under the Dairy Act, the district court misapplied Glickman and misconstrued the effect of the "entire regulatory scheme applicable to milk producers . . . ." (District Court Op. at 15 n. 5.) The Court in United Foods made clear that Glickman applied only in circumstances similar to Abood and Keller – in which individuals are "bound together" in a collective enterprise, such as a union or an integrated state bar, and the compelled subsidies are the "logical concomitant of a valid scheme of economic regulation."

13

533 U.S. at 412.

The provisions of the Dairy Act do not require milk producers to participate in a collective enterprise and do not compel them to market their product, fluid milk, according to any rules of a cooperative. Although the dairy industry is "regulated" in the sense that it is subject to a patchwork of state and federal laws, there is no association that all milk producers must join that would make the entire industry analogous to a union, an integrated bar or the collective enterprise at issue in Glickman.

The Dairy Act is a free-standing promotional program that applies to all dairy producers regardless of whether they are subject to marketing orders or any other dairy regulations. It is not ancillary to any collective enterprise or compelled association with a non-speech purpose because there is no such enterprise or association for milk that encompasses all dairy producers. Indeed, the AMAA provision for milk marketing orders, which preexisted the Dairy Act, authorizes the Secretary and marketing administrators to create dairy promotional programs that literally would be ancillary to the regulatory aspects of the milk marketing orders. See 7 U.S.C. 608c(5)(I). Congress chose not to utilize this precise provision of the AMAA, however, and instead adopted an entirely separate program which does not operate in concert with any collective aspect of any milk marketing order.

Moreover, as independent small-scale dairy producers, the Cochrans are exempted from the regional marketing orders under the AMAA and have chosen not to enter into manufacturing and marketing cooperatives. They, and they alone, determine how much milk to produce, how to sell and market it and to whom it will be sold. Nevertheless under the Dairy Act they are compelled to pay assessments to subsidize generic dairy advertising, a form of speech with which they are in total disagreement. Cf. Glickman, 521 U.S. at 471 (noting that "none of the generic advertising conveys any message with which respondents disagree").

Furthermore, as the Court in United Foods determined that speech is the principal purpose of the Mushroom Act, so it is of the Dairy Act.[11]   Indeed,

_____

[11] Congress' declared policy of the Mushroom Act was

> that it is in the public interest to authorize the establishment, through the exercise of the powers provided in this chapter, of an orderly procedure for developing, financing through adequate assessments on mushrooms produced domestically or imported into the United States, and carrying out, an effective, continuous, and coordinated program of promotion, research, and consumer and industry information designed to – (1) strengthen the mushroom

14

"almost all of the funds collected under the mandatory assessments are for one purpose: generic advertising." United Foods, 533 U.S. at 412. In United Foods, the Court made clear that compelled subsidies may not be upheld where they are only germane to a program whose "principal object is speech itself." Id. at 415.

We conclude, therefore, that being compelled to fund advertising pursuant to the Dairy Act raises a First Amendment free speech and associational rights issue. But our determination that the Act's compelled assessments for generic advertising implicate the Cochrans' First Amendment rights does not end our inquiry. As this court held in Frame, "[t]he rights of free speech and association are not absolute. Thus, we must next identify the proper standard for evaluating whether the statute . . . nevertheless passes constitutional muster." 885 F.2d at 1133.[12]

industry's position in the marketplace; (2) maintain and expand existing markets and uses for mushrooms; and (3) develop new markets and uses for mushrooms.

7 U.S.C. § 6101(b). Congress' declared purpose for the Dairy Act is

that it is in the public interest to authorize the establishment . . . of an orderly procedure for financing (through assessments on all milk produced in the United States for commercial use and on imported dairy products) and carrying out a coordinated program of promotion designed to strengthen the dairy industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for fluid milk and dairy products.

7 U.S.C. § 4501(b).

[12] Upon concluding that milk producers are regulated to a similar degree as the California tree fruit growers in Glickman, the district court applied a three-part test set forth by the Supreme Court in Glickman: (1) whether the Act imposes a restraint on the freedom to communicate; (b) whether the Act compels any person to engage in any actual or symbolic speech; (c) whether the Act compels dairy producers to endorse or finance any political or ideological views. (District Court Op. at 16-18.) This test, however, is inappropriate because, like the Supreme Court in United Foods, we have concluded that the Dairy Act is not a species of economic regulation, as it is not ancillary to a more comprehensive program restricting the marketing autonomy of dairy farmers. In United Foods the Court did not apply this three-part test. Nor do we.

VI.

This case is properly characterized as a compelled commercial speech case. See United Foods, 533 U.S. at 410; Frame, 885 F.2d at 1146 (Sloviter, J., dissenting). The Supreme Court, however, has left unresolved the standard for determining the validity of laws compelling commercial speech, and the circuit courts are divided on the issue. There are at least four variations in the judiciary's cumulative experience. One is the more lenient standard applied to commercial speech cases. See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 564 (1980). Another is the "germaneness" test of compelled speech cases. See, e.g., Abood, 431 U.S. at 235-236. Still another is an adaptation of the commercial speech standard. See Livestock Marketing, 335 F.3d at 722-723. And, in Frame, a pre-Glickman and pre-United Foods case, this court applied the stringent level of scrutiny for associational rights cases. 885 F.2d at 1134. We now summarize the various standards.

A.

In Central Hudson, the Supreme Court held that to evaluate the constitutionality of regulatory restrictions on commercial speech the Constitution requires only intermediate scrutiny – namely, that (1) the state must "assert a substantial government interest"; (2) "the regulatory technique must be in proportion to that interest"; and (3) the incursion on commercial speech "must be designed carefully to achieve the State's goal." 447 U.S. at 564. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." Id. at 561.

But the Court has left open the question of whether Central Hudson's more relaxed First Amendment test applies to cases involving compelled commercial speech. In United Foods the Court stepped back from addressing the issue in ipsis verbis, explaining: "the Government itself does not rely upon Central Hudson to challenge the Court of Appeals' decision, . . . and we therefore do not consider whether the Government's interest could be considered substantial for purposes of the Central Hudson test." 533 U.S. at 410. Nevertheless, in the earlier case of Glickman, the Court questioned the application of the commercial speech test to compelled speech cases:

> The Court of Appeals fails to explain why the Central Hudson test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech. Given the fact that the Court of Appeals relied on Abood for the proposition that the program implicates the First Amendment, it is difficult to understand why the Court of Appeals did not apply Abood's "germaneness" test.

521 U.S. at 474 n. 18.

Indeed, in United Foods,

16

notwithstanding its specific disclaimer regarding Central Hudson, the Court seemingly applied the "germaneness" test:

> The only program the Government contends the compelled contributions serve is the very advertising scheme in question. Were it sufficient to say speech is germane to itself, the limits observed in Abood and Keller would be empty of meaning and significance. The cooperative marketing structure relied upon by a majority of the Court in Glickman to sustain an ancillary assessment finds no corollary here; the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of Abood extends to the party who objects to the compelled support for this speech. For these and other reasons we have set forth, the assessments are not permitted under the First Amendment.

533 U.S. at 415-416 (emphasis added).

As we previously explained, the purpose of the Dairy Act is in all material respects the same as that of the Mushroom Act at issue in United Foods, and the Dairy Act is not ancillary to a broader cooperative marketing regime like the fruit tree marketing orders at issue in Glickman. The compelled assessments for generic dairy advertising under the Dairy Act are germane to nothing but the speech itself. "[A]lmost all of the funds collected under the mandatory assessments are for one purpose: generic advertising." Id. at 412. It would thus seem that the Dairy Act would not survive Abood's germaneness test.

Other courts have applied the germaneness test to cases involving compelled assessments pursuant to promotional programs and have rejected the application of Central Hudson. See, e.g., Michigan Pork, 348 F.3d at 163 (noting that "[e]ven assuming that the advertising funded by the [Pork] Act is indeed commercial speech, the more lenient standard of review applied to limits on commercial speech has never been applied to speech – commercial or otherwise – that is compelled"); In re Washington State Apple Adver. Comm'n, 257 F. Supp. 2d 1274, 1287 (E.D. Wash. 2003) (concluding that "[b]ecause the Commission's assessments do not restrict speech, it is inappropriate to apply the Central Hudson test for restrictions on commercial speech").

In Livestock Marketing, however, the Eighth Circuit concluded that an adaptation of the Central Hudson test applied, explaining that "Central Hudson and the case at bar both involve government interference with private speech in a commercial context." 335 F.3d at 722. All the same, the court concluded that the Beef Act did not survive the intermediate scrutiny of

17

Central Hudson. Id. at 725-726. Relying on the reasoning set forth in United Foods, the court determined that the beef checkoff program is in all material respects identical to the mushroom checkoff program, and concluded that "the government's interest in protecting the welfare of the beef industry by compelling all beef producers and importers to pay for generic beef advertising is not sufficiently substantial to justify the infringement on appellees' First Amendment free speech right." Id.

Finally, in Frame, which was decided before the teachings of both Glickman and United Foods, this court applied the stringent associational rights standard but nevertheless upheld the constitutionality of the Beef Act, 7 U.S.C. § 2901 et seq. Back in 1989, this court concluded that the government's interest in "maintaining and expanding beef markets proves . . . compelling[,]" and "[m]aintenance of the beef industry ensures preservation of the American cattlemen's traditional way of life." Frame, 885 F.2d at 1134-1135 (citations omitted).

Judge Sloviter, however, dissented on this issue in Frame:

I doubt that the type of compelled speech at issue here can be justified on any basis. Nonetheless, I do not reach the majority's stringent associational rights standard because I believe that no justification can be found, even under the less exacting criteria adopted by the Supreme

Court in evaluating the permissibility of regulation of commercial speech [in Central Hudson] . . . . While the government has a general interest in the health of the beef industry, it does not follow that the government has a substantial interest in compelling the beef industry to make and support such a promotion campaign. Instead, . . . the messages represent the economic interests of one segment of the population . . . .

Id. at 1146-1147 (Sloviter, J., dissenting) (citations and internal quotations omitted).

As in Frame, the Government here argues that it has a sufficient interest in increasing the demand for an agricultural product. Moreover, the Government contends that it has an interest in decreasing its obligation to purchase dairy products under the price support program, 7 U.S.C § 1446. We previously have emphasized, however, that the Court's subsequent holding in United Foods that clarified and limited the teachings of Glickman, cut away the underpinning of this court's analysis in Frame. United Foods makes clear that the government may not compel individuals to support an advertising program for the sole purpose of increasing demand for that product. 533 U.S. at 415. In United Foods, the Court concluded that the Mushroom Act's compelled subsidies would be unconstitutional even under the lesser

18

scrutiny accorded to commercial speech. Id. at 410.

Although the Government's contention that it has a substantial interest in decreasing its obligation under the dairy price support program is somewhat unique from the government interest asserted in United Foods, this interest is undermined by the fact that as a stand-alone statute, the Dairy Act does not operate in conjunction with the price support program. Indeed, producers of liquid milk such as the Cochrans are not covered by the support program. Moreover, reductions in the government's obligations under the price support program are insignificant to the Dairy Promotion Program's existence, as whether the compelled assessments continue is controlled by the dairy producers via the referendum process. 7 U.S.C. § 4506(a).

We conclude, therefore, that the government's interest in promoting the dairy industry is not sufficiently substantial to justify the infringement on the Cochran's First Amendment free speech and association rights. As Judge Sloviter suggested in her dissent in Frame, promotional programs such as the Dairy Act seem to really be special interest legislation on behalf of the industry's interest more so than the government's. We believe that the Supreme Court reached the same conclusion by ruling in United Foods that the compelled assessments pursuant to the Mushroom Act are not permitted by the First Amendment.

B.

In light of the reluctance of the Supreme Court in United Foods to enter the controversy over the applicable scrutiny for compelled commercial speech cases, however, we will follow suit. "[W]e find no basis under either Glickman or our other precedents to sustain the compelled assessments sought in this case." 533 U.S. at 410.[13]

The compelled assessments for generic dairy advertising under the Dairy Act relate to speech and only to speech. Indeed, "almost all of the funds collected under the mandatory assessments are for one purpose: generic advertising." Id. at 412.

Measured by any degree of scrutiny set forth in the foregoing discussion, we conclude that this case runs on all fours with the teachings and holding of United Foods, and accordingly hold that the Dairy Promotion Stabilization Act of 1983 does not survive the First Amendment challenge lodged by Appellants Joseph and Brenda Cochran. The district court erred in sustaining the constitutionality of the Dairy Act on the basis of Glickman.

* * * * *

_____

[13] We reach this conclusion whether accepting the standard explicitly expressed in Frame or deciding that in view of the Court's discussion in United Foods, that standard is not longer controlling.

In sum, we conclude that the generic advertising pursuant to the Dairy Promotion Stabilization Act of 1983 does not constitute government speech and is therefore subject to First Amendment scrutiny. We hold that the Dairy Act violates the Cochrans' First Amendment free speech and associational rights. Although the dairy industry may be subject to a labyrinth of federal regulation, the Dairy Act is a stand-alone law and the compelled assessments for generic dairy advertising are not germane to a larger regulatory purpose other than the speech itself.

The judgment of the district court sustaining the constitutionality of the Dairy Promotion Stabilization Act of 1983 will be reversed and the proceedings remanded with a direction to enter a decree in favor of Appellants in accordance with the foregoing.


RENDELL, Circuit Judge, concurring.


I join in our opinion and judgment but write separately to register my view that, having found that the assessments do not pass muster under the Supreme Court's analysis in United Foods, and, having noted at the end of Pat IV that the compelled subsidies were assessed to support a program whose principal object was speech itself, we need not engage in the exercise of determining the "standard" regarding the extent of the government's interest for purposes of a commercial speech analysis under Central Hudson, as the opinion does

at Part VI-A. Twice – in both Glickman and United Foods – the Supreme Court has questioned the need for engaging in a Central Hudson analysis.[14] And, I think it

[14]The Court has not treated these cases as involving a discrete commercial speech issue, instead indicating that "[t]he question is whether the government may underwrite and sponsor speech with a certain viewpoint using special subsidies exacted from a designated class of persons, some of whom object to the idea being advanced." United Foods, 533 U.S. at 410; see also id. (stating that, even if commercial speech is less protected than other speech, there is "no basis under either Glickman or our other precedents to sustain the compelled assessments," but refusing to consider "whether the Government's interest could be considered substantial for purposes of the Central Hudson test"); Glickman, 521 U.S. at 474 & n.18 (noting that it was "error for the [Ninth Circuit] to rely on Central Hudson for the purpose of testing the constitutionality of market order assessments for promotional advertising," and stating that the Ninth Circuit "fails to explain why the Central Hudson test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech"). In fact, in United Foods the Court appears to explicitly endorse the applicability of the Abood/Keller germaneness test: "It is true that the party who protests the assessment here is required simply to support speech by others, not to utter the speech itself. We conclude, however, that the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who,

20

unnecessary to apply <u>Central Hudson</u> in light of the Court's analysis in <u>United Foods</u>.[15]

In <u>United Foods</u> the Court distinguished the situation it faced from the one it considered in <u>Glickman</u> by examining the following question: Is the challenged assessment part of a "broader regulatory system" that does not have speech as its primary object. 533 U.S. at 415. There appear to be two parts to this basic inquiry. First, are the plaintiffs part of a group that is "bound together and required . . . to market their products according to cooperative rules?" <u>Id.</u> at 412.

---

nevertheless, must remain members of the group by law or necessity." 533 U.S. at 413 (citing <u>Abood</u> and <u>Keller</u>).

[15]The Sixth Circuit, in <u>Michigan Pork Producers Ass'n, Inc. v. Veneman</u>, 348 F.3d 157 (6th Cir. 2003), also rejected the application of the <u>Central Hudson</u> test to an assessment created by a similar promotional program. I find that court's comments on this matter to be instructive: "[W]e find inapplicable to this case the relaxed scrutiny of commercial speech analysis provided for by <u>Central Hudson</u>, and relied upon by Appellants. The Pork Act does not directly limit the ability of pork producers to express a message; it compels them to express a message with which they do not agree. Even assuming that the advertising funded by the Act is indeed commercial speech, the more lenient standard of review applied to limits on commercial speech has never been applied to speech – commercial or otherwise – that is compelled. It is one thing to force someone to close her mouth; it is quite another to force her to become a mouthpiece." <u>Id.</u> at 163 (citation omitted).

Second, is the assessment regulation related to and in furtherance of other non-speech purposes, carrying out other aspects to further other economic, societal, or governmental goals? <u>Id.</u> at 415. Even if the answer to the first question is "no," the assessment might nonetheless be permitted if it is not <u>only</u> related to speech. This second inquiry could signal consideration of "germaneness" if, in fact, other goals were implicated. But here, we answered "no" to both questions: we decided that the Cochrans did not surrender their freedom to make independent competitive choices to any collective enterprise, and we concluded that speech was the <u>only</u> purpose of the Dairy Act. Thus, it was purely "compelled speech," forbidden by <u>United Foods</u> under <u>any</u> level of scrutiny. 533 U.S. at 410. In fact, after discussing the various standards potentially applicable here, Judge Aldisert clearly states in the ensuing Part VI-B that under <u>any</u> level of scrutiny, the assessments for speech only do not pass constitutional muster given <u>United Foods</u>. The analysis in Part VI-A regarding the proper level of scrutiny is therefore unnecessary, and, I believe, dicta.

---