[No. 39635-1-II.   Division Two.   November 9, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. RONALD STEEN, *Petitioner*.

790

792

793

*Reed Manley Benjamin Speir*, for petitioner.

*Mark E. Lindquist, Prosecuting Attorney*, and *Melody M. Crick, Deputy*, for respondent.

*Sarah A. Dunne, Nancy Lynn Talner, Shawn J. Larsen-Bright*, and *Lauren H. Offenbecher* on behalf of American Civil Liberties Union of Washington, amicus curiae.

¶1 PENOYAR, C.J. — Police officers knocked on a trailer door at the scene of a reported disturbance and ordered any occupants to exit with their hands up. Ronald Steen, the sole occupant, did not open the door. The officers lawfully entered the trailer through an open window under the community caretaking exception to the warrant requirement. The officers discovered and detained Steen, who refused to provide his name and date of birth. A jury convicted Steen of obstructing a law enforcement officer, RCW 9A.76.020(1), based on these facts. He appeals, arguing that (1) insufficient evidence supports the conviction, (2) RCW 9A.76.020(1) is unconstitutional as applied because it violates his First and Fifth Amendment rights to remain silent, and (3) the prosecutor committed misconduct by filing the charge and by introducing testimony of and commenting on his pre- and postarrest silence. We affirm.

## FACTS

¶2 On July 9, 2008, Deputy Andrew Finley responded to a "disturbance" at a Puyallup property that involved "one female, possibly two males." Clerk's Papers (CP) at 340. He observed a woman, who was visibly upset, on the property. Her eyes were red, and she had "mascara running down her cheeks." CP at 341. At trial, Finley testified that the woman had exited a trailer on the property. Deputy Tanya Terrones arrived to assist. Both deputies arrived at the scene in patrol cars and wore uniforms.

¶3 After speaking with the woman, the deputies looked around the property for the other individuals. At trial, Finley explained why the deputies looked around:

> [W]e're trying to figure out . . . because of the original call if there's possibly three people involved in the disturbance. Um I wanted to make sure that anybody else was still on the property and not going to jump out behind a bush or something.

It's just when we go into unknown situations we're always looking for anybody that still might be at the scene.

. . . .

They could be injured. They could be hiding with a weapon. Somebody could be ready [to] ambush you. . . . [I]t's important for us to feel like we're safe in that environment or somebody else is safe and everybody's there that should be there and if they're not there we need to determine that they are not there.

CP at 342-43.

¶4 After checking a barn and some nearby bushy areas, the deputies told the woman that they needed to look in the trailer, which was locked. At trial, Terrones described the trailer as a "travel trailer" that was 7 feet wide and 12 feet long. CP at 325. Finley called it "a trailer you put a Fifth Wheel on the back of a truck [sic]" and estimated that it was 7 to 8 feet wide and 15 to 30 feet long. CP at 348. The woman told the deputies that the trailer did not belong to her and that she did not have a key.

¶5 Terrones walked around the trailer for three to four minutes and peered through the windows, some of which were open. Terrones then knocked "very loudly" on the trailer's door and said, "Pierce County Sheriff's department. Come out with your hands [up]." CP at 325. She heard no movement inside. After 30 or 45 seconds, she knocked "very loudly" again, stating, "Pierce County Sheriff's department. I'm going to conduct a building search. Come out with your hands up." CP at 325. Finley described the deputies' knocking efforts as follows:

[W]e're knocking on the door, yelling out the Sheriff's department. You know we're outside. Anybody inside the trailer needs to come out please. Ah, we'd knock many times. There's some open windows where there's just the screen and stuff in there so it would have been easy to hear us. Ah we can make as much ruckus as possible . . . because no cops like to go into a building or a house that we are not familiar with and search.

CP at 346.

¶6 Because the deputies were concerned that somebody in the trailer might need emergency assistance,[1] Finley helped Terrones enter through an open window. Terrones unlocked the door for Finley. The deputies immediately noticed Steen approaching them from the back bedroom and ordered him to put his hands up.[2] Steen complied and asked, "[W]hat do you want? I was just sleeping." CP at 348. Finley asked Steen whether there was anyone else in the trailer, and Steen said no. Finley handcuffed Steen and put him in the back of a patrol car.

¶7 Terrones repeatedly asked Steen for his name and date of birth while he sat in the back of the patrol car. Steen did not provide this information. Forty-five minutes later, the deputies determined Steen's identity and arrested[3] him on an outstanding arrest warrant.

---

[1] The trial court concluded that the community caretaking exception to the warrant requirement justified the deputies' warrantless entry into the trailer. Steen does not challenge this conclusion on appeal. The community caretaking exception " 'allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to render aid or assistance or when making routine checks on health and safety.' " *State v. Smith*, 165 Wn.2d 511, 522, 199 P.3d 386 (2009) (quoting *State v. Thompson*, 151 Wn.2d 793, 802, 92 P.3d 228 (2004)).

[2] The record on review makes clear that Steen did not live in the trailer, did not own the property where the trailer was located, and did not have the owner's permission to be in the trailer. Specifically, Finley testified during a pretrial motion that a man named Jack Essman owned the property and the trailer. Finley testified that when he called Essman less than 10 minutes after he arrived on the scene, Essman informed him that "nobody was to be in the trailer." CP at 123. Because the jury did not hear this testimony, we do not rely on it as part of our sufficiency analysis. Nevertheless, we recount this testimony here to point out that the dissent's reliance on cases stating that citizens have special protection against governmental intrusions into their homes is misplaced. *See* dissent at 817 (quoting *Miller v. United States*, 357 U.S. 301, 307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958); *State v. Hatcher*, 3 Wn. App. 441, 446, 475 P.2d 802 (1970)).

[3] Steen argues that he was arrested when Finley handcuffed him inside the trailer, not when the deputies "formally" arrested him after determining his identity. Appellant's Br. at 18 n.1. Thus, he appears to characterize his refusal to provide his name and date of birth as "post-arrest silence" and his refusal to answer the door and exit the trailer with his hands up as "pre-arrest silence." We accept this characterization for purposes of Steen's prosecutorial misconduct argument.

¶8 The State charged Steen in Pierce County District Court with obstruction of a law enforcement officer. Deputies Finley and Terrones were the only two trial witnesses, and they testified consistent with the above facts. The trial court instructed the jury that "[a] defendant's mere refusal to answer questions is not sufficient grounds to arrest for obstruction of a police officer." CP at 17 (Instruction 8). A jury convicted Steen as charged.

¶9 Steen appealed his conviction to Pierce County Superior Court, which affirmed. *See* RALJ 2.2(a). We granted discretionary review.[4]

## ANALYSIS

### I. Sufficiency of the Evidence

¶10 Steen argues that the State presented insufficient evidence that he obstructed a law enforcement officer. Specifically, he argues that (1) the State failed to present sufficient evidence that he knew the officers were discharging their official duties when they knocked on the trailer door; (2) the mere act of remaining silent, without more, is insufficient to establish that he hindered, delayed, or obstructed the officers; and (3) the officers' testimony that he refused to provide his name and date of birth and to exit the trailer should not have been admitted as substantive evidence of his guilt because he had a right to remain silent under both the First and Fifth Amendments. We conclude that the jury had sufficient evidence to convict Steen of obstruction.

### A. Standard of Review

¶11 In a RALJ appeal, we review the district court's decision for errors of law. RALJ 9.1(a); *see State v. Ford*, 110 Wn.2d 827, 829, 755 P.2d 806 (1988) (stating that

---

[4] Amicus American Civil Liberties Union of Washington (ACLU) filed a brief in support of Steen.

RALJ 9.1 standards, which by their terms apply only to superior court review, also govern our Supreme Court's review). When reviewing a sufficiency challenge, we view the evidence in the light most favorable to the State in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). We interpret all reasonable inferences in the State's favor. *Hosier*, 157 Wn.2d at 8.

■ ■ ¶12 Statutory interpretation is a question of law that we review de novo. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). In construing a criminal statute, our objective is to determine the legislature's intent. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). If the statute's meaning is plain on its face, we give effect to that plain meaning as an expression of legislative intent. *Jacobs*, 154 Wn.2d at 600. If, however, the statute is subject to more than one reasonable interpretation, it is ambiguous and the rule of lenity requires us to interpret the statute in the defendant's favor absent legislative intent to the contrary. *Jacobs*, 154 Wn.2d at 600-01.

B. Obstruction of a Law Enforcement Officer

■ ■ ¶13 "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." RCW 9A.76.020(1). "Hinder" means "to make slow or difficult the course or progress of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1070 (2002). "Delay" means "to stop, detain, or hinder for a time . . . [;] to cause to be slower or to occur more slowly than normal." WEBSTER'S at 595. "Obstruct" means "to be or come in the way of : hinder from passing, action, or operation." WEBSTER'S at 1559. A person acts willfully when he acts knowingly with respect to the material elements of the offense. RCW 9A.08.010(4).

### 1. Willfulness

¶14 Steen first asserts that his failure to open the door was not obstruction because he did not know that the officers were discharging their official duties.[5] He therefore contends that he did not willfully obstruct the deputies because "there [was] no way he could have known what the deputies were doing or why they wanted entry into the trailer, or even that the deputies were trying to enter the trailer." Appellant's Br. at 18. According to Steen, the "only evidence before the jury" was "that he was sleeping when the deputies knocked on the door to the trailer and was awakened by their activity." Appellant's Br. at 17-18.

¶15 Steen's assertions misapprehend the nature of a sufficiency challenge in which we view all evidence and reasonable inferences in the light most favorable to the State. *See Hosier*, 157 Wn.2d at 8. Viewed in this light, the facts show that the deputies, who arrived in patrol cars and wore police uniforms, repeatedly knocked "very loudly" on the trailer's door, "yell[ed]" out "Sheriff's department," and asked any occupants to exit the trailer. CP at 325, 346. The trailer was small—between 7 to 8 feet wide and 12 to 30 feet long—and had "open windows," making it easier to hear the officers' commands. CP at 346. A woman had recently exited the trailer and was visibly upset. A jury could have reasonably inferred from these facts that Steen (1) had heard the officers' identification and commands but had decided not to comply and (2) knew that the officers wanted to look inside the trailer to investigate a recent disturbance involving the woman. Accordingly, this argument fails.

---

[5] Steen does not argue, however, that the officers were not in fact discharging their "official powers or duties" when they knocked on the trailer's door. *See* RCW 9A.76.020(1). He argues only that he did not know they were doing so.

### 2. Failure To Obey a Lawful Police Command Can Constitute Obstruction when Officers Are Performing Community Caretaking Functions

¶16 Steen argues that the "act of remaining silent" is insufficient to establish the crime of obstruction. Appellant's Br. at 19. We agree that Steen's refusal to provide his name or date of birth, when considered in isolation, is insufficient to support an obstruction conviction. Under Washington law, "[a] person cannot be punished for refusing to speak." *State v. Williams*, 171 Wn.2d 474, 484, 251 P.3d 877 (2011) (citing *State v. Contreras*, 92 Wn. App. 307, 316, 966 P.2d 915 (1998) ("mere refusal to answer questions is not sufficient grounds to arrest for obstruction of a police officer")); *accord State v. Hoffman*, 35 Wn. App. 13, 15-17, 664 P.2d 1259 (1983) (obstruction arrest not lawful where defendant refused to provide identification to police officer).

¶17 But our analysis does not end there. We must resolve how Steen's failure to obey the officers' lawful orders to open the trailer's door and to exit with his hands up—orders that the officers issued while performing their community caretaking functions—impacts the sufficiency analysis.

¶18 Under RCW 9A.76.020(1)'s plain language, a person may commit obstruction by willfully disobeying a lawful police order in a manner that hinders, delays, or obstructs the officer in the performance of his or her duties. Thus, as we explained in the previous section, because any rational fact finder could have reasonably inferred that Steen ignored the officers' commands, there was sufficient evidence to conclude that his conduct was willful. Additionally, there was sufficient evidence that this willful conduct hindered, delayed, or obstructed the officers in the performance of their community caretaking functions. Finley testified that he and Terrones arrived on the scene in an "unknown situation[ ]" and that their investigation required them to

look for the other individuals who were reportedly involved in the disturbance and for anyone who was injured. CP at 343. Finley was aware that the distraught woman on the property had exited the trailer. As part of their investigation, the officers knocked on the trailer for several minutes, to no avail, before entering through the window. From this testimony, the jury could have reasonably inferred that Steen's decision not to open the trailer's door impeded the officers' ability to locate the unaccounted-for participants in the disturbance, to render any necessary aid to victims, and to investigate the nature and causes of the reported disturbance. Accordingly, the jury could have found that Steen's conduct here—ignoring the officers' lawful orders to exit the trailer with his hands up while the officers were performing their community caretaking functions—was willful conduct that amounted to obstruction.

¶19 Our interpretation is consistent with *Contreras*, in which we held that an individual's failure to follow police officers' lawful orders authorized the individual's warrantless arrest for obstruction. 92 Wn. App. at 317. There, we concluded that the arrest of a vehicle prowl suspect for obstruction was lawful where the suspect did more than "merely refuse to talk" but, rather, "disobeyed the officer's orders to put his hands up in view of [the officer], to exit the car, to keep his hands on top of the car, and to provide his name." *Contreras*, 92 Wn. App. at 316-17;[6] *see also State v. Little*, 116 Wn.2d 488, 496-97, 806 P.2d 749 (1991) (plurality opinion) (individuals' refusal to obey officers' lawful command to stop "hindered, delayed and/or obstructed" the officers in the discharge of their official duties).[7]

¶20 We are mindful of our Supreme Court's recent opinion in *Williams*, in which the court held that "some conduct

---

[6] Apart from disobeying police commands, the suspect in *Contreras* also gave officers a false name. 92 Wn. App. at 316.

[7] *Little* involved a previous version of the obstruction statute that employed the same "hinder[s], delay[s], and obstruct[s]" language as the current statute. *Compare* former RCW 9A.76.020(3) (1975), *with* RCW 9A.76.020(1).

in addition to making false statements" is required to support an obstruction conviction. 171 Wn.2d at 486. That requirement is met here. Steen's refusal to open the trailer door and exit the trailer with his hands up amounts to "conduct" that is punishable under the obstruction statute. Significantly, the *Williams* court distinguished *Contreras* as a case involving more than a false statement to police officers: "In *Contreras* . . . the defendant not only gave a false name but refused to comply with orders to keep his hands in view and exit the vehicle." 171 Wn.2d at 484 n.10. Similarly here, Steen refused to comply with the officers' orders to answer the trailer's door and to exit with his hands up. Today, we follow *Contreras* and conclude that the plain language of RCW 9A.76.020(1) signals the legislature's intent to criminalize an individual's willful failure to obey a lawful police order where the failure to obey willfully hinders, delays, or obstructs the officer in the discharge of his or her community caretaking functions.[8] We further conclude, based on the foregoing analysis, that sufficient evidence supported Steen's obstruction conviction.[9]

---

[8] We do not hold, as the dissent suggests, that "private citizens have an affirmative obligation to assist police when they are performing their community caretaking function." Dissent at 817 n.15. Private citizens have no such affirmative duty. Nor do we hold, as the dissent suggests, that private citizens commit obstruction of a law enforcement officer "every time they refuse to assist the police in performing their community caretaking function." Dissent at 818-19. A citizen's mere refusal to assist police officers performing their community caretaking duties, without more, is not a crime under the plain language of the obstruction statute. As our opinion makes clear, the citizen's conduct is criminal in these circumstances only when the State can prove beyond a reasonable doubt that (1) the citizen willfully failed to obey a lawful police order and (2) the citizen's failure to obey had very specific consequences—namely, it hindered, delayed, or obstructed the officer while the officer was performing his or her community caretaking duties.

[9] Amicus ACLU cites several cases, including cases from other state courts and one Ninth Circuit case, *United States v. Prescott*, 581 F.2d 1343 (9th Cir. 1978), to argue that an individual cannot commit obstruction by refusing to answer police knocks at the door. We have reviewed the state cases and do not find them persuasive. Additionally, we conclude that *Prescott* is distinguishable. There, the defendant refused to unlock her door to allow officers to search her apartment for a mail fraud suspect. *Prescott*, 581 F.2d at 1347. The court reversed the defendant's conviction for assisting a federal offender in order to prevent his apprehension, 18 U.S.C. § 3, because her "passive refusal to consent to a warrantless search [was]

### 3. Refusal To Open Door and Answer Questions as Exercise of First and Fifth Amendment Rights

¶21 Steen next argues, as part of his sufficiency claim, that he had a constitutional right to remain silent under the First and Fifth Amendments. Thus, in his view, the State could not use his refusal to open the trailer door or to provide his name or date of birth as substantive evidence of his guilt.

¶22 In sections II and III below, we thoroughly consider and reject Steen's contention that he had a constitutional right to refuse to provide his name and date of birth or to refuse to open the trailer door and reveal his presence to officers. As section II explains, the main First Amendment case that Steen cites for support, *Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), is a factually distinguishable case involving governmental action that forced citizens to display government-approved ideological messages on their private property. Furthermore, as section III explains, because Steen's name, date of birth, and presence were not "incriminating" communications, at least as the United States Supreme Court has interpreted that term, he was not privileged under the Fifth Amendment from revealing that information. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 190-91, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004).

### II. First Amendment Challenge to RCW 9A.76.020

¶23 Steen argues that RCW 9A.76.020 is unconstitutional as applied because he had a First Amendment "right to choose to remain silent."[10] Appellant's Br. at 12. He

---

privileged conduct which cannot be considered as evidence of criminal wrongdoing." *Prescott*, 581 F.2d at 1351. Here, unlike in *Prescott*, the officers did not pressure Steen to consent to a warrantless search; rather, while trying to secure the scene of a disturbance and assist victims, the officers lawfully ordered any occupants of the trailer to exit with their hands up.

[10] Steen argues that the State conceded a First Amendment violation when it failed to address this argument in its response brief in his RALJ appeal to the

asserts that the First Amendment protects individuals from "any forced speech," not just speech involving religion, politics, or ideology. Appellant's Br. at 12. Steen characterizes his refusal to open the trailer's door or to reveal his name or date of birth as "constitutionally protected speech." Appellant's Br. at 12. This argument fails.

## A. Standard of Review

¶24 A statute's constitutionality is a question of law that we review de novo. *State v. Abrams*, 163 Wn.2d 277, 282, 178 P.3d 1021 (2008). In an as applied challenge to a statute's constitutionality, a party alleges that the statute's application in the specific context of the party's actions is unconstitutional. *State v. Brosius*, 154 Wn. App. 714, 718, 225 P.3d 1049 (2010). A decision that a statute is unconstitutional as applied does not invalidate the statute but, rather, prohibits the statute's future application in a similar context. *Brosius*, 154 Wn. App. at 718-19.

## B. First Amendment Analysis

¶25 The First Amendment, which applies to the states through the Fourteenth Amendment's due process clause, provides in relevant part, "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amends. I & XIV, § 1; *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

¶26 Steen relies primarily on three cases to support his argument that "the First Amendment grants all US Citizens the right to choose not to speak, even in the context of a police officer requesting the person to identify themselves." Appellant's Br. at 12. As we discuss below, none of these cases supports his argument.

---

superior court. Steen relies on *State v. Ward*, 125 Wn. App. 138, 143-44, 104 P.3d 61 (2005), a case in which Division One of this court stated, without discussion, that the State conceded a defendant's double jeopardy argument on appeal by failing to respond to it. Because we are not bound by an "erroneous concession related to a matter of law," we reject Steen's argument. *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 875, 50 P.3d 618 (2002).

¶27 The first case, *Wooley*, involved a challenge to a New Hampshire statute that prohibited citizens from obscuring letters on vehicle license plates. 430 U.S. at 707. The State repeatedly prosecuted a man who covered the motto "Live Free or Die" on his car's license plate because it was repugnant to his moral, religious, and political beliefs. *Wooley*, 430 U.S. at 707-08. The Court invalidated the New Hampshire statute on First Amendment grounds, holding that a state may not "require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Wooley*, 430 U.S. at 713, 717.

¶28 Steen interprets *Wooley*'s holding too broadly. He relies on the Court's expansive "right to refrain from speaking" language from the following passage to support his argument that *Wooley* applies to his situation:

> We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely *and the right to refrain from speaking at all.* A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. *The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind."*

430 U.S. at 714 (emphasis added) (citations omitted) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)).

¶29 But *Wooley* addressed a much narrower issue—whether a government could force citizens to display repellent ideological messages on their private property under threat of penalty:

> New Hampshire's statute in effect requires that appellees use their private property as a "mobile billboard" for the State's ideological message—or suffer a penalty. . . . The First Amend-

ment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable.

430 U.S. at 715. Here, the investigating officers did not force Steen to foster or advocate an idea that Steen found morally objectionable. *Wooley* does not provide persuasive support for Steen's argument that he had a First Amendment right to keep his door shut and to not answer police questions.

¶30 The second case that Steen relies on involved a police officer who responded to a citizen's phone call that a suspicious individual was walking around near the railroad tracks. *See State v. White*, 97 Wn.2d 92, 95, 640 P.2d 1061 (1982). The officer asked the individual for identification, which he denied having. *White*, 97 Wn.2d at 95. When the officer asked the individual where he lived, the individual answered evasively and pointed toward some houses. *White*, 97 Wn.2d at 95. Shortly thereafter, the individual produced a wallet with a driver's license and told the officer, " 'I lied to you, I don't live anywhere.' " *White*, 97 Wn.2d at 95. The officer arrested the individual for violating the first two subsections of an earlier version of Washington's obstruction statute. *White*, 97 Wn.2d at 95-96. That statute, which the court characterized as a "stop-and-identify" statute, read:

> Obstructing a public servant. Every person who, (1) without lawful excuse shall refuse or knowingly fail to make or furnish any statement, report, or information lawfully required of him by a public servant, or (2) in any such statement or report shall make any knowingly untrue statement to a public servant, or (3) shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties; shall be guilty of a misdemeanor.

Former RCW 9A.76.020 (1975) (emphasis omitted); *White*, 97 Wn.2d at 95-96. The *White* court held that subsections

(1) and (2) of former RCW 9A.76.020 were unconstitutionally vague. 97 Wn.2d at 96, 101.

¶31 The *White* court acknowledged that although stop-and-identify statutes could be "valuable tools" in preventing and detecting crime, they could also "result in disturbing intrusions into an individual's right to privacy and can implicate other rights specifically enumerated in the Bill of Rights." 97 Wn.2d at 97. In a footnote, the *White* court listed four "possible" constitutional challenges to stop-and-identify statutes, noting in relevant part that "the identification requirement may be violative of an individual's First Amendment right not to speak." 97 Wn.2d at 97 n.1 (citing *Wooley*, 430 U.S. at 709; *Barnette*, 319 U.S. at 633[11]).

¶32 *White* invalidated two subsections of former RCW 9A.76.020 on constitutional vagueness grounds, not on First Amendment grounds. Thus, the court's passing observation that a First Amendment challenge to a stop-and-identify statute is "possible" is not binding authority. *See White*, 97 Wn.2d at 97 n.1. Also, *Wooley* and *Barnette*, the cases that *White* cited in its footnote, involved situations, respectively, in which the government forced citizens to display a message ("Live Free or Die") or to perform an act (pledge of allegiance) that they considered morally, religiously, or politically repugnant. *Wooley*, 430 U.S. at 707-08; *Barnette*, 319 U.S. at 626 n.2, 629. Steen asks us to convert *White*'s passing dicta into a broad constitutional rule that escapes the confines of the United States Supreme Court's First Amendment jurisprudence. *See, e.g., United States v. United Foods, Inc.*, 533 U.S. 405, 410, 121 S. Ct. 2334, 150 L. Ed. 2d 438 (2001) (characterizing *Wooley* and *Barnette* as cases in which the First Amendment "may

---

[11] *Barnette* invalidated, on First Amendment grounds, a state board of education's resolution making the pledge of allegiance compulsory. 319 U.S. at 626 n.2, 642.

prevent the government from compelling individuals to express certain views"). We decline to do so.[12]

¶33 The third case Steen cites, *City of Mountlake Terrace v. Stone*, 6 Wn. App. 161, 492 P.2d 226 (1971), likewise does not support his position. In that case, Division One of this court invalidated, on vagueness grounds, a city ordinance that contained language similar to former RCW 9A.76.020. *Stone*, 6 Wn. App. at 162, 164. In its analysis, the court illustrated the ordinance's vagueness by formulating a long list of questions that an interrogatee would have to ask himself or herself before determining whether he or she was legally required to answer a police officer's questions. *Stone*, 6 Wn. App. at 167-69. One question the court proposed was "May the information be required before the interrogatee is . . . warned of his constitutional right to remain silent either under the Fifth or possibly the First Amendments[?]" *Stone*, 6 Wn. App. at 167. We do not read this language as an affirmative holding that an individual has a First Amendment right to not respond to police questions.

¶34 Unlike *Wooley* and *Barnette*, the officers here did not compel Steen to express any particular viewpoint that he found repugnant or morally objectionable. Instead, as part of their routine investigation into a reported disturbance, they asked Steen to exit the trailer with his hands up and give them his name and date of birth. These orders did not infringe on Steen's First Amendment rights.

---

[12] Neither Steen nor amicus ACLU convincingly explains how cases involving governmental regulation of commercial speech apply here. *See* Appellant's Br. at 11-12 (citing *United States v. Pourhassan*, 148 F. Supp. 2d 1185 (D. Utah 2001)); Amicus Br. at 7 (citing *United Foods*, 533 U.S. at 409-16; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988)). Amicus ACLU also suggests, without significant analysis, that Steen's refusal to respond to police questions "could be considered a form of silent protest" akin to a peaceable sit-in to protest a public library's whites-only policy. Amicus Br. at 13 n.5 (citing *Brown v. Louisiana*, 383 U.S. 131, 86 S. Ct. 719, 15 L. Ed. 2d 637 (1966) (plurality opinion)). Accordingly, we decline to address these cases.

III. Fifth Amendment Challenge to RCW 9A.76.020

¶35 Steen argues that RCW 9A.76.020 is unconstitutional as applied because he had a Fifth Amendment right to remain silent before and after being placed in custody. Specifically, he argues that he had a reasonable belief that "revealing his presence inside the trailer to police and identifying himself to the police could be used in a criminal prosecution or could lead to other evidence that might be so used since Steen was aware that there were warrants for his arrest." Appellant's Br. at 15. We disagree.

A. Standard of Review

¶36 As we noted above, we review an applied challenge to a statute's constitutionality de novo. *See Abrams*, 163 Wn.2d at 277.

B. Fifth Amendment Analysis

¶37 The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This provision applies to the states through the Fourteenth Amendment's due process clause. U.S. Const. amend XIV, § 1; *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled. *Hiibel*, 542 U.S. at 189. An incriminating communication is " 'any disclosure[ ] that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.' " *Hiibel*, 542 U.S. at 190 (quoting *Kastigar v. United States*, 406 U.S. 441, 445, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972)). "Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." *Hiibel*, 542 U.S. at 191.

¶38 *Hiibel* is instructive. There, police received a call about an assault that occurred in a red and silver truck.

*Hiibel*, 542 U.S. at 180. The responding police officer discovered the defendant standing next to the truck. *Hiibel*, 542 U.S. at 180-81. The defendant repeatedly refused to provide his driver's license or other identification to the officer. *Hiibel*, 542 U.S. at 181. The State charged the defendant with "willfully resist[ing], delay[ing], or obstruct[ing] a public officer in discharging or attempting to discharge any legal duty of his office." *Hiibel*, 542 U.S. at 181 (citing former Nev. Rev. Stat. § 199.280 (1995)). According to the State, the legal duty that the officer was discharging at the time that the defendant "willfully resist[ed], delay[ed], or obstruct[ed]" the officer derived from Nevada's "stop and identify" statute:

"1. Any peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime.

" . . . .

"3. The officer may detain the person pursuant to this section only to ascertain his identity and the suspicious circumstances surrounding his presence abroad. *Any person so detained shall identify himself*, but may not be compelled to answer any other inquiry of any peace officer."

*Hiibel*, 542 U.S. at 181-82 (emphasis added) (quoting former Nev. Rev. Stat. § 171.123 (1995)).

¶39   The *Hiibel* court concluded that the defendant's duty to disclose his name under the stop and identify statute "presented no reasonable danger of incrimination" and, therefore, did not implicate his Fifth Amendment privilege against self-incrimination. *Hiibel*, 542 U.S. at 189-90. Rather, the defendant "refused to identify himself only because he thought his name was none of the officer's business." *Hiibel*, 542 U.S. at 190. The defendant's belief that he should not have to disclose his identity did not "override the Nevada Legislature's judgment to the contrary absent a reasonable belief that the disclosure would tend to incriminate him." *Hiibel*, 542 U.S. at 190-91.

¶40 Likewise, the Fifth Amendment privilege did not apply here because Steen could not reasonably believe that disclosing his presence, name, or date of birth would incriminate him. *See Hiibel*, 542 U.S. at 191. First, Steen cites no authority, and we find none, to support his assertion that his presence in the trailer is a "communication" subject to Fifth Amendment protection. Second, Steen's contention that the existence of an outstanding arrest warrant for an unrelated crime converted the disclosure of his name and date of birth into incriminating communications is unpersuasive. Although the officers' knowledge of his name and date of birth would have enabled them to identify and arrest Steen on the outstanding warrant, these facts did not "incriminate" Steen because they did not enable the State to prosecute him for a separate offense. *See Hiibel*, 542 U.S. at 191 ("[A] case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense."). Stated differently, the probable cause that incriminated Steen with regard to the crime listed in his arrest warrant had already been presented to the neutral and detached magistrate who issued the warrant; revealing his name and date of birth would not have further incriminated him in that crime. Indeed, the *Hiibel* court explicitly recognized in its Fourth Amendment discussion that "[o]btaining a suspect's name in the course of a *Terry* stop serves important government interests," including "inform[ing] an officer that a suspect is wanted for another offense." *Hiibel*, 542 U.S. at 186 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). RCW 9A.76.020 is not unconstitutional as applied to Steen because he was not privileged from revealing his name, date of birth, or presence to police.

¶41 Steen's Fifth Amendment discussion relies extensively on *State v. Easter*, 130 Wn.2d 228, 922 P.2d 1285 (1996). In *Easter*, the defendant was involved in a car

accident and refused to answer the responding officer's questions about the accident and whether he had been drinking. 130 Wn.2d at 230. Police later arrested the defendant for vehicular assault. *Easter*, 130 Wn.2d at 231. At trial, the officer testified that the defendant ignored the officer's questions at the accident scene. *Easter*, 130 Wn.2d at 232. The officer described the defendant as a " 'smart drunk,' " meaning he " 'was evasive, wouldn't talk to me, wouldn't look at me, wouldn't get close enough for me to get good observations of his breath and eyes[;] I felt that he was trying to hide or cloak.' " *Easter*, 130 Wn.2d at 233. The prosecutor relied extensively on the "smart drunk" theme in closing argument. *Easter*, 130 Wn.2d at 234. The *Easter* court held that the State violated Easter's right to silence by eliciting testimony that called the jury's attention to the defendant's prearrest silence to imply his guilt. 130 Wn.2d at 241, 243.

¶42 *Easter* is distinguishable. In *Easter*, the court held that the State's use of the defendant's prearrest silence invited the jury to infer from the defendant's silence that he committed the underlying substantive offense of vehicular assault. *See* 130 Wn.2d at 241, 243. Here, in contrast, Steen's refusal to open the door, reveal his presence, and exit with his hands up—what he characterizes as prearrest silence—*was* substantive evidence of his guilt of the crime of obstruction.

IV. Prosecutorial Misconduct

¶43 Steen argues that the prosecutor committed misconduct by (1) charging Steen with obstruction, (2) introducing the officers' testimony of Steen's pre- and postarrest silence as substantive evidence of his guilt, and (3) commenting on Steen's pre- and postarrest silence in closing argument.

A. Filing Obstruction Charges

¶44 "[P]rosecutors are vested with wide discretion in determining how and when to file criminal charges."

*State v. Lewis*, 115 Wn.2d 294, 299, 797 P.2d 1141 (1990) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)). Exercise of this discretion involves consideration of numerous factors, including the public interest as well as the strength of the State's case. *Lewis*, 115 Wn.2d at 299 (citing *United States v. Lovasco*, 431 U.S. 783, 794, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)). Here, because the evidence supported an obstruction conviction, the prosecuting attorney's office properly exercised its discretion when it charged Steen.

B. Reference to Steen's Silence in Testimony and Closing Argument

¶45 A police witness may not comment on the defendant's silence so as to infer guilt from a refusal to answer questions. *State v. Lewis*, 130 Wn.2d 700, 705, 927 P.2d 235 (1996). A comment on the defendant's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the defendant's silence was an admission of guilt. *Lewis*, 130 Wn.2d at 707.

¶46 In the context of closing arguments, the prosecutor has "wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006). The defendant has the burden to show that the prosecutor's conduct was both improper and prejudicial. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Prosecutorial misconduct is grounds for reversal only where there is a substantial likelihood the improper conduct affected the jury. *Fisher*, 165 Wn.2d at 747. If the defendant does not object to the misconduct at trial, the defendant must demonstrate that the misconduct is " 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' " incurable by a jury instruction. *Gregory*, 158 Wn.2d at 841 (quoting *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)).

¶47 Here, as we discuss at length above, an individual's willful refusal to obey a lawful police order may constitute obstruction if the refusal hinders, delays, or obstructs the officer in the performance of his or her community caretaking functions. Accordingly, the State properly elicited testimony that Steen refused to obey the officers' orders by not exiting the trailer with his hands up. It follows that the State could use this properly elicited testimony in closing argument to argue that Steen committed obstruction.

¶48 Although the State should not have relied on the officers' testimony that Steen refused to give his name and date of birth as substantive evidence in closing argument that he committed obstruction, the trial court's "mere refusal" instruction (instruction 8) cured this misconduct, which Steen never objected to at trial. The trial court's instruction clearly communicated to the jury that it could not convict Steen based solely on his refusal to answer questions. Accordingly, Steen did not suffer prejudice.

JOHANSON, J., concurs.


¶49 QUINN-BRINTNALL, J. (dissenting) — Because Ronald Steen was not required to open the door to officers who did not have a warrant, complied with requests that he raise his hands and keep them in full view after officers lawfully entered the trailer through a window, and merely exercised his right to remain silent when officers requested that he provide his name and date of birth, in my opinion, the evidence is insufficient as a matter of law to support the jury's verdict finding Steen guilty of obstructing a law enforcement officer under RCW 9A.76.020. I respectfully dissent.

¶50 Here, Deputies Andrew Finley and Tanya Terrones properly responded to a domestic disturbance involving "one female, possibly two males." Clerk's Papers (CP) at

340. After quickly locating a woman outside of a locked trailer, and observing that she had no sign of physical injuries, the officers looked around the property for other individuals. Finding no one, they then knocked on the trailer door for 15 to 20 minutes while loudly announcing their presence and asking anyone inside to come out with their hands up. At no time did the officers ever indicate that anyone inside was under arrest or that the officers had a warrant to search the trailer. Eventually, the officers lawfully entered the residence without a warrant, to conduct a welfare-type check and ensure that there was not a third party injured in the home requiring assistance. Upon entering the trailer, the officers noticed Steen near the back bedroom area and ordered him to raise his hands. He complied, asking, "[W]hat do you want? I was just sleeping." CP at 348. He further informed officers that nobody else was inside the trailer. Finley then handcuffed Steen and put him in the back of his patrol car while he and Terrones continued to investigate the reported dispute. When asked to identify himself by providing his name and date of birth, however, Steen remained silent. Steen was eventually charged with obstructing a law enforcement officer under RCW 9A.76.020 and found guilty at trial.

¶51 To sustain a conviction for obstruction under RCW 9A.76.020, the State had to prove, beyond a reasonable doubt, both that (1) Steen willfully hindered, delayed, or obstructed a law enforcement officer and (2) the law enforcement officer was acting in the discharge of his or her official powers or duties. Although I agree with the majority that the officers properly investigated the reported disturbance and lawfully entered the residence under their community caretaking authority to ensure there was no third person requiring assistance and that the evidence is sufficient to support the second element of the charged crime, I cannot agree that Steen's decision to decline to cooperate was unlawful.

¶52 Mindful of our Supreme Court's recent opinion in *State v. Williams*, 171 Wn.2d 474, 251 P.3d 877 (2011), the

majority wisely avoids contending that Steen's refusal to identify himself to officers is "conduct" punishable under the obstruction statute.[13] Instead, the majority argues that the jury could have found that Steen's "ignoring the officers' lawful orders to exit the trailer with his hands up" amounted to obstruction. Majority at 801. In support of this contention, the majority cites to a footnote in *Williams* reading, " 'In [*State v. Contreras*, 92 Wn. App. 307, 316, 966 P.2d 915 (1998)] the defendant not only gave a false name but refused to comply with orders to keep his hands in view and exit the vehicle' " (majority at 802 (quoting *Williams*, 171 Wn.2d at 484 n.10)), then argues that it must follow *Contreras* because "here, Steen refused to comply with the officers' orders to answer the trailer's door and to exit with his hands up." Majority at 802. In *Contreras*, however, officers responded to a call about a possible vehicle prowl and found the defendant behind the steering wheel of a car. 92 Wn. App. at 309. Worried for their own safety, officers demanded that the suspect exit the vehicle and, when he did not, forcibly removed him. *Contreras*, 92 Wn. App. at 309-10.

¶53 Courts have recognized that asking someone to exit a vehicle, especially upon suspicion of both criminal activity and danger to responding officers, is a de minimis intrusion of a citizen's right to be free from arbitrary searches or

---

[13] In deciding *Williams*, the Washington Supreme Court states, "We hew to our jurisprudential history of requiring conduct in addition to pure speech in order to establish obstruction of an officer." 171 Wn.2d at 485. Though I agree in the present circumstances that Steen's silence did not amount to conduct, this dichotomy between "conduct" and "pure speech," is problematic. The United States Supreme Court, for instance, has long used the example that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52, 39 S. Ct. 247, 63 L. Ed. 470 (1919). And the Washington Supreme Court, in *City of Kennewick v. Keller*, confirmed the illegality of "fighting words," words " 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.' " 11 Wn. App. 777, 785, 525 P.2d 267 (1974) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)). Likewise, a citizen intentionally misdirecting law enforcement officers pursuing a fleeing felon by telling them the felon went north when he had seen him travel south engages in the conduct of obstruction by misdirection by use of words even if he does not engage in conduct by pointing his arm.

seizures. *See, e.g., Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977); *State v. Kennedy*, 107 Wn.2d 1, 9, 726 P.2d 445 (1986). Thus, the officers in *Contreras* were well within the scope of their rights to demand that the defendant exit the vehicle. Steen, however, was not operating or sitting in a motor vehicle in a public right of way. Instead, he was quietly staying inside the trailer. Thus, it is highly questionable as to whether, absent a warrant, Steen had a duty to comply with the officers' orders to exit the trailer in the same way as the officers' demands in *Contreras*.[14] Both the common law and the laws of Washington afford special protection to citizens against arbitrary searches of their homes.[15] In *Miller v. United States*, for example, the Supreme Court attributes William Pitt, Earl of Chatham, as stating, " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake . . . but the King of England cannot enter.' " 357 U.S. 301, 307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958), (quoting THE OXFORD DICTIONARY OF QUOTATIONS 379 (2d ed. 1953)). Division One of this court noted, in *State v. Hatcher*, 3 Wn. App. 441, 446, 475 P.2d 802 (1970), that "the protective constitutional moat which surrounds every man's home—his castle—may not be indiscriminately drained either by police policy or judicial fiat." (Footnote omitted.) And in its recent decision in *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1862, 179 L.Ed. 2d 865 (2011), the United States Supreme Court states,

---

[14] I do not intend to imply that it is in any way unlawful for officers to knock on a person's door and request to come inside or ask the occupant to come outside. Officers can always seek consensual contact with citizens and should do so when there is reason to believe another citizen requires their assistance. Such a request though, is simply that—a request—and does not carry any coercive authority requiring a citizen to respond.

[15] Whether Steen actually owned the trailer is irrelevant. The necessary implication of the majority's opinion—that private citizens have an affirmative obligation to assist police when they are performing their community caretaking function—will, in the future, apply to homeowners whether the majority intended this result or not. Though this may make sense from a public policy standpoint, it is not the court's place to make such a determination.

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. Cf. *Florida v. Royer*, 460 U.S. 491, 497-498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)[ ] ("[H]e may decline to listen to the questions at all and may go on his way").

(Second alteration in original.) Here, whether Steen heard the officers knocking or not, he had no obligation to allow them to enter the residence without a warrant.

¶54 Officers Finley and Terrones lawfully entered the trailer without a warrant pursuant to their community caretaking function, to ensure that nobody inside was hurt. I agree with the majority that in the circumstances here presented, such a warrantless entry was justified. The majority, however, now asserts that when an officer lawfully is relieved of the burden of obtaining a warrant for a search or seizure, and a citizen declines to cooperate voluntarily with that officer's directives, that citizen must necessarily be willfully (and unlawfully) hindering or delaying the law enforcement officers in performing their duties. Apart from the language in the *Williams* court's footnote previously discussed, the majority provides no support for this proposition.[16] Our exigent circumstances jurisprudence has never required affirmative action on the part of citizens, whether they are suspected of criminal activity or not. Instead, it focuses on the behavior of law enforcement officers (e.g., whether it is appropriate to enter a home when in hot pursuit of a criminal or whether an officer can forcibly enter a home, while attempting to execute a warrant, out of concern that a suspect is destroying evidence).

¶55 Extending the reasoning of the majority, citizens are now guilty of obstructing justice every time they refuse to

---

[16] The majority does make passing reference to *State v. Little*, 116 Wn.2d 488, 806 P.2d 749 (1991). That case, however, involved a suspect of a crime in progress fleeing from an officer and is inapposite.

assist the police in performing their community caretaking function. This simply cannot be the state of the law. In the present circumstances, Steen certainly did not aid officers in their community caretaking function. The law does not require this of him. But once officers lawfully let themselves into the trailer, Steen made no effort to obstruct the performance of their duties and accurately informed them that there was no one else in the trailer, i.e., no second man as originally reported. As a matter of law, in my view, the evidence presented is insufficient to prove that Steen committed the offense of obstructing a law enforcement officer in violation of RCW 9A.76.020 and I would reverse.[17]

Review denied at 173 Wn.2d 1024 (2012).

---

[17] Moreover, if alerting officers to his identity or presence inside the trailer could implicate him in a no-contact order violation, Steen had a Fifth Amendment right to decline to do so. The majority relies on *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004), to assert that Steen had no such right because " '[a]nswering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances.' " Majority at 809 (quoting *Hiibel*, 542 U.S. at 191). The *Hiibel* Court, though, shortly thereafter states, "Still, a case may arise where there is a substantial allegation that furnishing identity . . . would have given the police a link in the chain of evidence needed to convict the individual of a separate offense. . . . We need not resolve those questions here." 542 U.S. at 191. Steen's circumstances could present just such a case and, in result, the majority's reliance on *Hiibel* to dismiss all Fifth Amendment claims is unfounded.